**STATE of Tennessee, Appellee,**

v.

**Joe Wendell CLIFTON, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

March 10, 1994.

Permission to Appeal Denied by Supreme Court June 20, 1994.

Jerry H. Summers, Jeffrey W. Rufolo, Chattanooga, for appellant.

Charles W. Burson, Atty. Gen., and Amy L. Tarkington, Asst. Atty. Gen., Nashville, Gary D. Gerbitz, Dist. Atty. Gen., and Rodney Strong, Asst. Dist. Atty. Gen., Chattanooga, for appellee.

## OPINION

TIPTON, Judge.

The defendant, Joe Wendell Clifton, was convicted in a jury trial in the Hamilton County Criminal Court of criminally negligent homicide, a Class E felony. He was sentenced to two years, granted unsupervised probation for all but twenty-eight days, ordered to perform one hundred days of community service, and ordered to pay restitution in the amount of four thousand eighty-seven dollars, the amount proven to be the victim's funeral expenses. He appeals as of right, contending (1) that the evidence was not sufficient to convict him for criminally negligent homicide and (2) that the trial court erred in requiring him to serve twenty-eight days in confinement.

The case relates to the defendant guarding the Quick Cash Pawn Shop on the night of November 29, 1990, when he shot and killed Joe Tommy Duffy, Jr. The victim was found dead on the morning of November 30, 1990, lying in an open drainage ditch behind the pawn shop.

Walter Parson testified that his wife, Ann, owned the pawn shop since 1986. Parson testified that there had been numerous break-ins and thefts at the shop until he began spending nights at the shop sometime in 1987. He hired the defendant to spend the night at the shop on three or four nights during the two weeks preceding the incident in question. Parson admitted that he only knew the defendant by his first name, but hired him on Parson's son-in-law's recommendation. He said that he kept a refrigerator and a microwave oven in the back of the shop for whoever stayed. He acknowledged that he provided a loaded handgun for the

defendant's use when the defendant stayed in the shop.

The shop building spans a drainage ditch which is uncovered except under the road and the shop. The building is made primarily of twelve-inch concrete blocks. A shed, which Parson said was unused, is attached to the rear of the building beside the ditch. The shed was apparently sealed from the outside with tin siding on the outside of pressboard. An entrance way between the shop and the shed is sealed with plywood which forms an internal wall in the shop against which a refrigerator and a large metal safe were placed. Inside the shed was a pressboard or plywood panel blocking access to the plywood wall of the shop.

Mr. Parson testified that the defendant called him at home around 10:00 p.m. on the night of the 29th. The defendant told Parson that somebody was breaking into the back and that he could hear them talking. Parson said that he told the defendant to shoot a couple of rounds into the building where they could hear it in order to scare them away. In his testimony, Parson indicated that he did this knowing that the building was made of concrete blocks. Parson did not tell the defendant to call the police. He said that the defendant's voice was trembling and that the defendant was scared.

The Parsons arrived at the shop around thirty minutes after the defendant's call. Mr. Parson and the defendant went behind the shop with a flashlight. Parson said that they went into the shed through a hole where the tin and pressboard had been pulled or torn away. They saw nothing else and returned to the shop. The Parsons returned home without calling the police.

The next morning somebody came into the shop and told them that a body was lying in the ditch. It was at this point that Mr. Parson called the police. Chattanooga Police Officer Charles C. Hass found the victim's body in the drainage ditch behind the shop. He said that it was evident that the body had been there for several hours. No weapon was found around the victim. Officer Hass asked the defendant what had happened. Officer Hass testified that the defendant said that he heard metal being pulled away and

heard at least three voices. The defendant said that he yelled at the people, but continued hearing tin being torn away. The defendant stated that he did not know what to do and he called Mr. Parson. The defendant told Officer Hass that Parson told him to fire shots into the building in order to scare the people. The defendant said that he fired a couple of shots, heard no more noise and did not investigate any further. Officer Hass acknowledged that the shop was in a high crime area and that he had previously responded to two or three burglary calls involving the shop.

Mr. Parson testified that the panel in the shed near the plywood wall had been pulled away. He stated that the plywood wall was knocked in toward the refrigerator, although he admitted that he had not told this to the police. Also, he said that the refrigerator was on rollers and could be moved.

Both the police and Mr. Parson had photographs of the scene made. They reflect one bullet hole in the ceiling of the shop, another in the concrete block above the plywood wall and over the safe, and a third in the plywood over the refrigerator. Also, there was a hole in the panel found in the interior of the shed which Chattanooga Police Detective Dennis Pedigo attributed to the same bullet which penetrated the plywood wall and killed the victim.

Detective Pedigo testified that he investigated the case. He said that he did not recall seeing any damage to or indications of prying or loosening of the plywood wall by the refrigerator. He identified various photographs of the inside of the shop and the shed. The bullet hole above the refrigerator entered the plywood at a height of sixty-eight and one-half inches above the shop floor and exited the plywood into the shed at approximately the same height from the floor of the shed. Detective Pedigo testified about using a string to connect the hole in the plywood with the hole in the interior panel of the shed in such a fashion as to indicate that the plywood changed the direction of the bullet to a downward path into the shed. He identified a picture which included the defendant standing at the spot from which he fired the

fatal shot, as reported by the defendant to Pedigo. It shows the defendant to be some distance from the refrigerator, perhaps ten feet or more, and the bullet hole to be a matter of inches above the refrigerator.

Detective Pedigo conducted a taped interview of the defendant on the day the victim's body was found and the recording was played for the jury. In the interview the defendant said that he was lying in bed in another room watching TV when he heard "beating and hammering." He said he called Mr. Parson who told him to shoot "up high ... in the wall" to try to scare them off. He said he was scared and afraid that they were going to come into the shop. He said that he picked up a pistol and shot two times and waited a few minutes. He said he then heard talking by two voices and that the beating started again. He said that they were "really hammering and beating" when he shot the last time and that he was scared. He said that he could tell that "they" were up against the plywood where the refrigerator was sitting. The defendant acknowledged that he did not call the police, but he did not believe there would have been time for the police to get there. After the third shot, he did not hear any more noise. He said that when the Parsons arrived, he and Mr. Parson went out with a flashlight to investigate. Also, he said that Mr. Parson had previously told him that there had been several break-ins at the shop.

Dr. Frank King, the medical examiner, testified that the bullet entered the victim's right front chest "at 52 inches above the heel" on a downward path and separated into two pieces. The damage to the heart and aorta were such that death would result regardless of when treatment could have been received. Dr. King stated that the victim would have lost consciousness within five minutes of receiving the wound and that death would have occurred within thirty minutes. Tests reflected that the victim's blood alcohol content was between .16 and .18 percent and that trace amounts of several prescription drugs were present.

The defendant did not testify. However, Sammy Durham was called by the defense to testify regarding his being with the victim behind the pawn shop on the night in question. Although stating that he relied upon his privilege against self-incrimination, Durham agreed to answer questions regarding the taped interview he had with Detective Pedigo on December 1, 1990. In essence, Durham gave his account of the events. He said that he was a friend of the victim's family and that he and the victim had been out drinking. He said that he drank beer and liquor and that they went outside to smoke marijuana. When a car passed, they went behind the building. The bar is next door to the pawn shop. He said he was sick and throwing up when the victim jumped across the drainage ditch. He testified that he heard tin and said that the victim was standing on it. He denied telling Detective Pedigo that the victim was pulling tin from the shed.

Durham indicated that they smoked marijuana behind the shed. He said that his uncle is Sonny Boy Francis, who had worked for the Parsons at the pawn shop, spending the night. He said he might have mentioned this to the victim. He stated that he saw a hole in the shed and that the victim wanted to see what was in it. He said that the victim "no sooner stepped in there than a pop went off." He testified that the victim came out fast, ran around some trees, and slid into the ditch. He denied knowing that the victim was shot and thought the victim continued to run. He said he ran to the other side of the bar, then went back looking for the victim but was unable to find him. He stated that neither of them had a gun and he denied that he was acting as a lookout for burglary.

Durham initially denied making various statements to Detective Pedigo. However, after the recording of the interview was played to the jury, Durham admitted saying the things reflected on the tape, but said that a lot of it was not true. He said that he was so upset about the events at the time of the interview that he did not know what he was doing.

The recorded interview reflects that Durham said that he heard the victim pulling tin off and had yelled at him. Durham stated that evidently the victim had already kicked the wall in. The victim entered the shed for

a couple of seconds and came out. Durham said that he told the victim regarding his uncle working there and that his uncle would shoot him. The victim said that he was going back in to see if anybody was there, but Durham said that he told the victim not to go back. Durham stated that the victim was in the shed about a minute when Durham heard a gunshot and thought that he saw a flash of light. He said the victim bolted out and hollered. He stated that the victim ran, slid down the ditch and ran to the other side. He said that he was unaware that the victim was hurt.

When confronted with the test report not showing the presence of marijuana, Durham denied lying and said that they did smoke marijuana. He also said that they were drunk.

## I

■ In contesting the sufficiency of the evidence, the defendant's argument is essentially two-pronged. First, he contends that the evidence was insufficient to prove that his acts amounted to criminal negligence. Second, he contends that he was justified, as a matter of law, in shooting and killing the victim who was breaking into the shop in terms of self-defense and protection of property. In considering the question of criminal negligence when the defense of self-defense or protection of property is raised, we are mindful of their potential interrelation. That is, criminal negligence, as we discuss later, requires the creation of a substantial *and* unjustifiable risk by the defendant's conduct, in this case, shooting a deadly weapon. However, a showing that the defendant's shooting was justified for self-defense or for protection of property would necessarily show that the risk created by that conduct was not unjustified, even if the risk remained substantial. Under such circumstances, criminal negligence would not be proven. Although with this in mind, for convenience, we will review the sufficiency of the evidence regarding criminal negligence before considering the defenses raised.

■ Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in favor of the state, including any conflict in the testimony of the witnesses. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973).

### (A)

■ Criminally negligent conduct which results in death constitutes criminally negligent homicide. T.C.A. § 39–13–212. The particulars of the culpable mental state needed to show criminal negligence are provided in T.C.A. § 39–11–302(d) as follows:

'Criminal negligence' refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

As the Sentencing Commission Comments provide, criminal liability is based upon a higher degree of negligence than that required for civil liability.

In *State v. Owens,* 820 S.W.2d 757, 760–761 (Tenn.Crim.App.1991), this court stated that criminal negligence would exist if a person failed to perceive that his or her conduct presented a substantial and unjustifiable risk to another and such failure constituted a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. In *State v. Slater,* 841 S.W.2d 841, 842 (Tenn.Crim.App.1992), this court emphasized that the statutory definition specifies that the issue of whether the risk should have been perceived or was per-

ceived and then ignored must be viewed from "the accused person's standpoint."

██ In applying the foregoing, as a starting point, we note that there is no evidence, by inference or otherwise, that the defendant's shooting into the plywood wall at an approximate height of five feet eight inches was accidental in terms of his having the intent to shoot into the ceiling or the concrete wall as he had done with the other two shots. The jury could easily have concluded beyond a reasonable doubt that the defendant intended to shoot at the height the bullet entered the plywood, while knowing that at least one person, and probably two people, were on the other side of the wall. In this respect, absent sufficient justification, even if the jury accredited the defendant's statement that he intended only to scare the people off, it would be warranted to conclude that there was a substantial and unjustifiable risk that someone would be hit by the bullet.

██ Likewise, the evidence justifies a conclusion that the defendant was reasonably aware of, but ignored, the risk created by the third shot or that he, at least, should have been aware of the risk. In fact, intentionally shooting a firearm in the general direction of another person, particularly when the exact location of the other person is unknown, constitutes such a substantial risk of bodily harm or death that a jury would be easily justified, as in this case, to conclude that a failure to perceive the risk is a gross deviation from the standard of care that an ordinary person would exercise under all of the circumstances. Absent legal justification, the defendant's criminal negligence was sufficiently proven.

### (B)

██ Next, the defendant contends that the evidence shows that he had a reasonable belief that there was imminent danger of death or serious bodily injury so as to justify his shooting in self-defense. He also contends that the conduct was justified for protection of property. Our analysis begins with our appreciation that the issue of whether the defendant's conduct was justified is essentially a question of fact for the jury. *See State v. Williams,* 784 S.W.2d 660 (Tenn.

Crim.App.1989). Thus, in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal.

██ Relative to self-defense, T.C.A. § 39–11–611 provides in part as follows:

(a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

(b) Any person using force intended or likely to cause death or serious bodily injury within their own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Initially, we note that the defendant seeks to cloak himself with the presumption that arises by the unlawful and forcible entry of one's residence. He argues that his spending the night at the pawn shop makes the presumption applicable. We disagree. A person's intermittently spending the night at a business establishment as part of that person's part-time employment as a night watchman or security guard does not turn the establishment into a "residence" as that term is used in the self-defense statute. In this respect, we note that a person is not justified in using deadly force to prevent or terminate another's trespass on real estate which is not

the person's residence or to prevent or terminate unlawful interference with personal property. T.C.A. § 39–11–614(c).

■ The defendant contends that the proof clearly showed that he had a reasonable belief of imminent danger of death or serious bodily injury. He asserts that the proof shows that he was aware of intruders attempting to break in and that he had a reasonable belief that they had weapons. However, we note that the defendant never said that he believed that the intruders had weapons nor did he say he believed that he feared an imminent, serious assault. We note that the defendant stated that he was scared and afraid that the people were going to "come in on" him, but we do not believe that such necessarily equates, as a matter of law, with a reasonable belief that imminent danger of death or serious bodily injury existed so as to justify using deadly force.

The evidence reflects that the defendant was confronted with an attempted, forcible entry of the pawn shop. He obviously did not see the intruders and there is no evidence showing that the intruders possessed weapons. The very fact that the legislature limited the self-defense presumption to the unlawful and forcible entry of a residence reflects an intention that the forcible entry of a business establishment would not, as a matter of law, justify the use of deadly force.

■ Under the circumstances in this case, the jury was warranted in concluding that it was unreasonable for the defendant to believe that deadly force was immediately necessary to protect him against an intruder presenting an imminent threat of death or serious bodily injury. Also, as previously indicated, the jury was warranted in concluding that the third shot was an unreasonable use of force for the protection of property. Therefore, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the defendant's conduct was not justified, but constituted criminal negligence.

## II

The defendant takes issue with the trial court ordering him to serve twenty-eight days in confinement and he contends that he

should receive a completely suspended sentence. In response, the state essentially relies upon the mere fact that the defendant's conduct resulted in the death of another as sufficient reason for the trial court to order a small portion of the sentence to be served in confinement. It notes that the Sentencing Commission Comments to T.C.A. § 40–35–306 speak of split confinement or "shock probation" as a valuable means of combining both incarceration and rehabilitation.

■ Appellate review of the manner in which a sentence is to be served is *de novo* on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40–35–401(d). In this respect, it is incumbent upon the trial court to place in the record its determinations regarding the existence of enhancement and mitigating factors and its specific findings of fact upon which the principles of sentencing are based. T.C.A. §§ 40–35–209(c) and –210(f); *State v. Dies,* 829 S.W.2d 706, 710–711 (Tenn.Crim. App.1991). However, in this case, the trial court's findings, determinations and imposition of sentence consisted of the following:

All right. Based on the testimony I heard at the trial, the pre-sentence report, the statements of counsel, the Court sets his punishment at two years in the Department of Corrections. I will suspend that after he serves 28 days active time; that is four weeks. Then he must do 100 days of community service within two years. That's one day a week then for the rest of the two years. He must make restitution in the amount of $4,087 within five years. And he has 30 days to perfect an appeal. It will be unsupervised probation.

Since he's living in Bledsoe County, he can do his community service there, but he will have to file some kind of proof showing that he did community service over there, one day a week.

He can pay let's say $10 a month on the court costs. And he can begin that May the 10th.

We conclude that the trial court's sentencing in this case did not satisfy the statutory sentencing requirements. We have no means to establish what facts were deemed important by the trial court nor do we know

how the trial court viewed those *facts* relative to the sentencing principles which apply. Under these circumstances, no presumption of correctness can apply when there is no "affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991).

■ Ordinarily, the trial court's failure to follow the required sentencing procedures relative to the record would result in a remand for the purpose of either resentencing or appropriate completion of the record. *See, e.g., State v. Dies, supra, State v. Gauldin,* 737 S.W.2d 795 (Tenn.Crim.App.1987). However, because we view the record and the circumstances in this case to be sufficiently clear and the defendant does not contest the length of the sentence, we elect to exercise our authority pursuant to T.C.A. § 40–35–401(c) to direct the trial court to enter an order granting the defendant probation, without any period of confinement, with the other aspects of the sentence previously imposed to remain in place, including the fact that the probation is to be unsupervised.

■ In conducting a *de novo* review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40–35–102, –103 and –210; *see State v. Ashby, supra.*

■ The defendant is fifty-three years old and has an eighth grade education. He has no previous criminal record and there is no indication of previous criminal activity. The presentence report indicates that the defendant is in good physical and mental health and that he uses neither alcohol nor other intoxicants. He has worked for over nine years at the Sequatchie Handle Works

and was reported to be an excellent worker and a valued employee. After his conviction in this case, the defendant cooperated fully with the state, including giving testimony, in its prosecution of the surviving intruder, Sammy Durham.[1] The defendant expressed his sincere regret about killing the victim. At the sentencing hearing, the assistant district attorney general stated to the court that he believed the defendant to be "an honest man, who made a mistake," but that the jury returned the appropriate verdict. He did not request that confinement be required.

We note that the jury acquitted the defendant of both second degree murder and voluntary manslaughter. It is apparent from the evidence that the defendant's conduct was not motivated by an intent to violate the law. Likewise, although the use of a deadly weapon ordinarily constitutes an aggravating factor, the circumstances relating to the weapon's availability to the defendant and his use of it should not make his use of the weapon an issue of consequence relative to probation.

■ Pursuant to T.C.A. § 40–35–102(6), the defendant is presumed to be a favorable candidate for a sentencing alternative to confinement, absent evidence to the contrary. Also, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. T.C.A. § 40–35–103(2) and (4).

We recognize that the unlawful killing of another human being is generally viewed to be more serious, for sentencing purposes, than many other criminal acts. *See, e.g., Kilgore v. State,* 588 S.W.2d 567 (Tenn.Crim. App.1979). However, in *State v. Travis,* 622 S.W.2d 529, 535 (Tenn.1981), our supreme court concluded that an involuntary manslaughter conviction resulting from an act occurring without any actual intent to harm would not ordinarily reflect such a violent or heinous crime as to preclude, by itself, a grant of probation. We conclude that the

1. The record reflects that Durham was convicted of aggravated criminal trespass, a Class B misdemeanor.

defendant's offense was not sufficiently aggravated so as to outweigh the evidence supporting suspension of his entire sentence.

As to the state's contention that split confinement was appropriate as "shock probation," we acknowledge that cases exist in which a short period of confinement is particularly suited to address sentencing principles dealing with the need for confinement, for rehabilitation, and for appropriate use of alternatives to confinement. However, it is not necessarily warranted in every case. Under the circumstances in this case, we see no sufficient reason to justify a requirement of a period of confinement.

In consideration of the foregoing and the record as a whole, the defendant's conviction for criminally negligent homicide is affirmed. The sentence imposed by the trial court is affirmed, except that the term of the sentence shall be completely suspended. The case is remanded for the entry of an order consistent with this opinion and the defendant shall remain upon a personal recognizance bond pending any further proceedings in the case.

SCOTT, P.J., and WHITE, J., concur.