IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2008 Session

## STATE OF TENNESSEE v. JIMMY STUART MYNATT

**Direct Appeal from the Criminal Court for Knox County**
**No. 84540     Mary Beth Leibowitz, Judge**

---

**No. E2007-00482-CCA-R3-CD - Filed February 5, 2009**

---

The defendant, Jimmy Stuart Mynatt, appeals his convictions of first degree felony murder, second degree murder, and especially aggravated robbery. He was sentenced to life plus twenty-five years. On appeal, he contends that: the evidence was insufficient to support his convictions; the trial court should have granted his motion to suppress statements made to the police; and the trial court erred in instructing the jury. After careful review, we affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Jimmy Stuart Mynatt.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The defendant was convicted of the first degree felony murder of Fred Thomas, which occurred during the commission of a robbery. The defendant does not dispute that he fired the shot that killed the victim, but he does argue that the shooting was not a murder. On appeal, he contends that he shot the victim in self-defense.

Prior to trial, a hearing occurred on the defendant's motion to suppress his statements to the police. Patricia Tipton, a detective with the Knoxville Police Department, testified that she investigated the murder of the victim. She said that she spoke with the victim's daughter when she arrived at the crime scene, the victim's home. The detective testified that the daughter indicated that the defendant may have wanted to kill the victim. She said that her investigation revealed that the

victim's daughter had dated the defendant for several years and that the defendant had lived with the victim at one time.

The detective testified that the victim was killed in his home by the defendant. She said that the defendant was arrested on the day after the shooting and that he waived his rights and agreed to discuss the incident with her. According to the detective, the defendant discussed the events leading up to the shooting in a calm manner. She testified that the defendant may have used drugs within the twenty-four-hour period prior to her interview, but she did not think that he was under the influence or affected by his drug use during their conversation. She said she would have stopped the interview if she thought he was under the influence. The interview was videotaped and audio taped and, at one point, the defendant asked that the audio tape be stopped so he could discuss a plea. The detective turned off the audio recording but not the video recording.

The defendant admitted that he and two associates discussed going to the victim's house to rob him and acknowledged that they knew they might have to shoot the victim because of their knowledge that he kept guns in his home. The defendant did not admit that he went to the victim's home on the day of the shooting. He admitted that he was involved in planning the robbery but said that his co-defendants actually carried out the robbery. He further told the detective that he and his co-defendants opened the victim's safe and divided the contents. The defendant also admitted that he and a co-defendant had been to the victim's home earlier in the week where he stole the victim's daughter's purse containing crack and powder cocaine. He contended that the robbery scheme was planned after they used the drugs they had stolen from the victim's daughter. The defendant also acknowledged that he and his co-defendants burned the victim's truck.

The defendant testified that he had used crack and powder cocaine for five or six days before he was interviewed by the detective. He said that, when he was using cocaine, he thought only about getting high and that he used Valium and Hydrocodone pills in addition to the cocaine. He said he took the pills to block the memory of the incident. He did not recall signing the waiver form but acknowledged that it was his signature on the form. The defendant said he had only slept for a few hours before his interview with the detective. He admitted that he recalled the details surrounding the incident, including burning the victim's truck.

The court viewed the videotape of the interview with the defendant and determined that the defendant's statements were voluntary. Following the hearing, the trial court denied the motion to suppress the statements by written order.

During trial, the victim's neighbor testified that she was outside with her dogs on the morning of March 2, 2006. She said that she heard a sound like someone was beating on the victim's house. Next, she saw the victim come outside and say, "Come here, boy. Come here, boy. Don't make me put this bullet in you." She said that she saw a young man on the victim's front porch and that the young man also saw her. He stepped down from the porch when he saw the neighbor and said, "I was looking for Jenna or Jennie." She went inside her house after hearing about the gun.

Annie Marie Werner testified that she was a friend of the victim's granddaughter. She said that she knew the victim because she had lived with him. She testified that the victim was a former Marine with numerous health problems, including stomach hernias and an artificial leg. She said that the victim stored his medication and money in a safe in his bedroom. She testified that she knew the defendant because he had dated the victim's daughter. She said that she was at the victim's house on the day the defendant stole the purse belonging to the victim's daughter.

Ms. Werner testified that she went to the victim's house to check on him. She said that, when she arrived, the victim's cousin was sitting outside the victim's house waiting on him. The cousin said he thought the victim was running errands and he was waiting for him to get home. They decided to go into the victim's house. When she tried to use her key to gain entry, she discovered the door was unlocked. They called for the victim but got no answer. They discovered him lying on his bedroom floor with blood all around him. She said that the victim did not have a gun and that his body was cold to the touch.

Ivan Lynn Baird, a co-defendant, testified that he and the defendant used drugs, including crack cocaine and pills. He said that he was "doing a lot of drugs" with the defendant and other people during the week of February 27 through March 2, 2006. He said that he drove the defendant to the victim's home to get more drugs. He said that he stayed in the car while the defendant went to get the drugs. He testified that when the defendant approached the house, he heard a man say something to the effect of "don't let me fill you full of holes." He saw the defendant and victim exchange words but did not know what they said. He said he fled when he heard what he thought were two gunshots a few moments later.

Soon after Baird returned to his house, the defendant arrived in a white Toyota truck. The defendant had a safe with him which contained pill bottles, money, and a knife. They set aside one pill bottle to sell for cash. They then divided the money among the four people present. The co-defendant testified that the defendant said something to the effect of "I shot him" or "I had to shoot him." He said that the defendant and Tom Whittenberg decided to dispose of the Toyota truck. He said they took the truck to a side road, and Whittenberg and the defendant set fire to the truck. They left the truck to burn and went to a motel for the night. Baird said that the defendant traded drugs and, possibly, guns from the victim's house for a car and cash. They later used the cash to purchase crack which they smoked in the motel.

The doctor who performed the victim's autopsy testified that the victim suffered a single gunshot wound to his head, severe skull fractures, lacerations, and contusions of his brain. She said that the victim also demonstrated signs of several natural diseases. She testified the victim's blood alcohol level was .01, and his blood tested positive for a significant level of Oxycodone. She opined that the gun shot was fired at close range – between twelve and twenty-four inches. The location of the bullet in the victim's head indicated that the victim was possibly seated or trying to duck the bullet when he was shot. She did not discover any defensive wounds on the victim. She concluded that the gun shot wound to the head caused the victim's death.

Detective Tipton testified at trial that she investigated the victim's death. She said that the victim was lying on his bedroom floor and was surrounded by blood. She observed an indentation

-3-

on a foot chest in the victim's bedroom that looked like something heavy had been sitting on it. They discovered two spent shell casings, one on top of a pair of pants on the floor and one in the hallway. She also found a live cartridge under the victim's bed and an empty holster. They made a video tape recording of the crime scene.

The detective said that the defendant became a suspect following crime scene interviews with the victim's family. She learned that the defendant had been to the victim's home earlier in the week to visit the victim's daughter and that the defendant had previously resided with the victim. Following the defendant's arrest, they discovered a black canister containing Ambien pills on his person. She learned that the victim had a prescription for Ambien and that he kept them stored in such a container in his bedroom.

The detective testified that the defendant was read his rights and that he executed a waiver of rights form prior to their interview. She believed that the defendant was alert and responsive during their interview. She testified that their entire interview was video recorded and a portion of it was also audio recorded. The detective discovered that the defendant was very familiar with the victim's home, his property, and the medications he kept at home because of the time he had lived with him. She also found that the defendant knew the victim's routines very well, including that he often took long weekends to hunt. He told the detective that he had been to the victim's home earlier in the week to see the victim's daughter and that he had stolen her purse because it was full of drugs. Approximately halfway through the interview, the detective informed the defendant that the victim was dead. He said that the defendant did not react to the statement. The defendant asked that the audio recording be turned off so he could discuss a deal. The detective only turned off the audio recording and told the defendant that she could not make him promises regarding a plea deal.

The defendant told the detective that his co-defendants went to the victim's home to get the drugs. He said that Whittenberg went into the house while Baird stayed outside. He told the detective that Baird became frightened and left so Whittenberg took the victim's truck and returned with the safe. He admitted that he purchased acetone and used it to burn the victim's vehicle. The defendant did not admit that he was at the victim's home during the robbery and shooting.

Following the detective's interview with the defendant, his mother contacted the detective. She met with his mother and obtained a pair of his pants, which were later submitted for forensic testing. The parties stipulated that the pants were stained with the same blood type as the victim's.

Jana Shipley testified that she met the defendant about a week prior to the shooting. She said that she met Whittenberg, Baird, and the defendant at a crack house. She testified that he had a drug problem and frequently used crack cocaine. Shipley testified that the defendant and Baird left together on the day of the shooting and returned to the house separately. She had not seen the defendant with a gun before he left, but he had several guns and a safe when he returned. She went along with them when they left the truck in a remote area. She said that the defendant later told her that they had to "shoot the man." She also heard Whittenberg say that "the first person you kill is always the hardest."

-4-

The defendant testified that he met the victim through his ex-girlfriend, the victim's daughter. The defendant testified that he lived with the victim at one time. He said that he knew the victim kept guns in his home, specifically a .9 millimeter handgun. He testified that the victim and his family sold drugs for income. He said that he stole a purse belonging to the victim's daughter after she refused to lend him cocaine. He said that he took approximately an ounce of powder cocaine, approximately one-half ounce of crack cocaine, and between $600 and $700 in cash.

He testified that he was addicted to crack cocaine and acknowledged that he was a "crack head." He said that Whittenberg was a friend with a drug problem. The defendant said he was introduced to Baird and Shipley during the week of the shooting. He said he learned the victim was going hunting the week that he stole the purse. He intended to steal drugs from the victim's empty house when their drug supply began to run low. The defendant said that Baird did not know where they were going and drove where he was instructed. He said that he did not have a weapon when he arrived at the victim's home. He testified that he would not have gone to the victim's home if he believed the victim was there.

The defendant said he planned to steal the victim's safe. He said that he pounded on the victim's back door and did not get an answer. He then knocked on the front door and, again, got no answer. He then saw the victim come around the house with a gun drawn. The victim instructed him to "come here or he would shoot me." The defendant complied and went into the house as instructed. He said that they went into the bedroom where the defendant yelled and cursed at him for stealing the purse. The defendant testified that he was afraid because the victim was waving the gun in his face. He recalled that he grabbed the gun from the victim, but the victim grabbed another gun. He said that he told the victim to stop, then fired one shot which missed the victim. He said his second shot hit the victim and caused him to crumple onto the bed.

The defendant testified that he ran from the house, but Baird was gone. The defendant again went into the house and took four guns, the safe, and the keys to the victim's truck. He left in the victim's truck and returned to Baird's house. He said that he eventually told his friends that "it was either him or me, and he was going to shoot me." They divided the contents of the safe and left to destroy the truck.

He testified that he had been awake for five or six days straight when he gave his statement to the detective. He did not recall giving the statement but had seen the video recording. He admitted that he lied about Whittenberg's role in the robbery and shooting and said that only part of his statement to the detective was the truth. He acknowledged that he would lie to get himself out of trouble.

The defendant was convicted of felony murder, second degree murder, and especially aggravated robbery and was sentenced to life plus twenty-five years. His convictions for felony murder and second degree murder were merged.

Analysis

The defendant raises three issues on appeal. He contends that: the evidence was insufficient to support his convictions; the trial court improperly instructed the jury; and the trial court erred in denying his motion to suppress his statements.

First, we consider whether the evidence was sufficient to support the defendant's convictions. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

The defendant contends that there was insufficient evidence at trial to support his convictions. Here, the defendant's especially aggravated robbery conviction was the underlying felony to his felony murder conviction. Felony murder is defined in Tennessee Code Annotated section 39-13-202(a)(2) as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary, theft. . . ." There is no culpable mental state required except the intent to commit the enumerated offense. *See* Tenn. Code Ann. § 39-13-202(b).

Especially aggravated robbery is defined as a robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Especially aggravated robbery is a Class A felony. Tenn. Code Ann. § 39-13-403.

The defendant argues that the evidence was insufficient to support his conviction for first degree felony murder. Specifically, he contends that he should not have been convicted of felony murder because he did not intend to commit the underlying felony of especially aggravated robbery at the time he shot and killed the victim. He contends that he went to the victim's home because he

believed the victim was not at home. However, the defendant's intention for going to the victim's home was to steal drugs from the victim's safe. This admission demonstrates that the defendant had the intent to commit the felony of robbery at the time he shot and killed the victim.

The defendant also argues that his convictions were based largely on the testimony of his co-defendant and that the co-defendant's statements should not have been given much weight because he received a favorable plea agreement for his cooperation. Further, he argues that both his drug use and his co-defendant's drug use should be considered in weighing their statements to police. Basically, the defendant argues that the court should have given little weight to his statement to police following his arrest or to the testimony of his co-defendant. However, it is well-settled that questions about the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). The defendant has not met his burden of demonstrating that the evidence is insufficient to support the verdict. The evidence presented at trial was sufficient to support the underlying convictions.

Next, the defendant argues that the trial court should have granted his motion to suppress statements he made to police following his arrest. Specifically, he argues that his statement was heavily influenced by his drug use and a lack of sleep so as to make it an involuntary act. "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Questions surrounding the credibility of witnesses and the "resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id*. at 23. With deference to the trial court's findings of fact, an appellate court's review of a trial court's application of law to the facts is conducted under a *de novo* standard of review. *State v. Damron*, 151 S.W.3d 510, 515 (Tenn. 2004).

Here, the defendant was in custody at the time he made his statements to the police. He was read his rights and executed a waiver of his rights. The testimony adduced at trial reflects that the police had reason to believe that the defendant had used drugs as recently as within twenty-four hours of his interview. However, the detective testified that the defendant did not hesitate to discuss the incident with her and that he was responsive and articulate during their discussion. She testified that he would correct her if she made a misstatement or if she misunderstood him. She further stated that she would have stopped the interview if she believed he had been under the influence while they were talking.

The trial court made written findings noting that the defendant's demeanor did not indicate that he was unable to voluntarily waive his rights or make a statement. The proof reveals that the defendant understood his right to counsel as well as his right to remain silent and that he voluntarily waived those rights. A trial judge's factual determination on the voluntariness of a defendant's confession is conclusive on appeal if there is any material evidence to support it. *State v. Johnson*, 661 S.W.2d 854, 860 (Tenn. 1983). The defendant has not offered any evidence to support his argument other than his own statements. Therefore, we affirm the judgments from the trial court.

Next, the defendant argues that the trial court erred in instructing the jury. Specifically, he argues that the trial court should have supplemented the jury instructions after receiving a jury

question during deliberation regarding self-defense. The standard of review for questions concerning the propriety of jury instructions is *de novo* with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

A trial judge is vested with the authority to give supplemental instructions when the jury poses a question that indicates the jurors are confused regarding a question of law. *State v. Dulsworth*, 781 S.W.2d 277, 288 (Tenn. Crim. App. 1989).

> A question from a deliberating jury often represents a pivotal moment in a criminal trial. Particularly in a close case [], a trial judge has a 'duty of special care' when responding to a request for 'further light on a vital issue' from the foreperson of a confused jury . . . 'When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.'

*U.S. v. Duncan*, 850 F.2d 1104, 115 (6th Cir. 1988) (citations omitted).

Self-defense requires a reasonable belief that "force is immediately necessary to protect against the other's use or attempted use of unlawful force" and that there was an "imminent danger of death or serious bodily injury" to the defendant. Tenn. Code Ann. § 39-11-611(a). The State bears the burden of proving that the defendant did not act in self-defense when the defendant relies upon a theory of self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Whether an individual acted in self-defense is a factual determination to be made by the jury as sole trier of fact. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). If the jury rejects the claim of self-defense, "in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton,* 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

The defendant argues that the State's closing argument misled the jury as to the timing of when the defendant raised the claim of self-defense. The State argues that the defendant did not object to these statements when they were made during closing argument. The State argued in its closing argument that the defendant waited to raise the defense of self-defense and pointed out that the defendant never told police that he shot the victim in self-defense.

During deliberations, the jury submitted a question asking when the defendant should have been legally obligated to inform the court he would argue self-defense. The trial court responded "Please refer to the self-defense instruction." The first portion of the self-defense instruction stated that the defendant included a plea of self-defense with his plea of not guilty. The State argues this indicated that the defendant raised his claim of self-defense at the time he pled not guilty. The State further argues that the jury simply needed to reread the instruction to discover the answer to their question.

The defendant relies on *State v. Lucius Macineo Moss*, No. 03C01-9501-CR-00002, 1996 Tenn. Crim. App. LEXIS 274 (Tenn. Crim. App. May 2, 1996, at Knoxville), to support his argument. The State argues that there are two important differences between the facts of *Moss* and the underlying case. First, the record in *Moss* was not clear as to the instructions given to the jury

regarding the self-defense claim, and, second, the jury in *Moss* submitted their question twice requesting clarification. The State argues that the defendant is not entitled to a new trial because the apparent jury confusion in *Moss* is not present here. We agree. In *Moss*, the jury asked the court during deliberations for clarification as to when the right to claim self-defense went away due to the defendant's actions. Here, the jury was inquiring as to when the defendant needed to claim that he acted in self-defense. The court answered by suggesting that they look at the instructions that indicated the defendant had claimed self-defense since he entered his plea of not guilty. The defendant has failed to show that the jury's inquiry required a supplemental jury instruction and, therefore, is not entitled to relief on this issue.

## Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE