IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2016

## STATE OF TENNESSEE v. FRANCISCO G. PARVIN

**Appeal from the Criminal Court for Greene County**
**No. 15CR003      John F. Dugger, Jr., Judge**

_____

### No. E2016-01196-CCA-R3-CD

_____

Defendant, Francisco G. Parvin, was indicted by the Greene County Grand Jury for aggravated assault resulting in serious bodily injury in Count 1 and aggravated assault by the use of a deadly weapon in Count 2. Following a jury trial, Defendant was convicted in Count 2 of the lesser-included offense of assault and sentenced to 11 months and 29 days, with 120 days to be served in jail and the remainder to be suspended on probation. The record does not contain a judgment form in Count 1, but the record indicates that only Count 2 was submitted for trial. Presumably, Count 1 was dismissed. The offenses in both counts were against the same victim. In this appeal as of right, Defendant contends that the evidence was insufficient to support his conviction in Count 2. After a careful review of the entire record and the parties' briefs, we conclude that the evidence was sufficient to sustain Defendant's conviction. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Francis X. Santore, Jr., Greeneville, Tennessee, for the appellant, Francisco G. Parvin.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Dan E. Armstrong, District Attorney General; and J. Chalmers Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

*Facts*

Defendant was charged with the stabbing of his mother's boyfriend, Derrick Groff. Defendant's mother, Trixie Lane, testified that Groff, Defendant, Ms. Lane's sister, Leoma Gregg, her husband, Scott Gregg, and their daughter, Haley Gregg, were all living in Ms. Lane's apartment. On November 21, 2014, Ms. Lane and Groff went to the grocery store. When they returned, Ms. Lane followed Groff into the bedroom, where Groff opened a bottle of pills, counted them, and claimed that six pills were missing. Groff said he "want[ed] to know which MF in there took [his] medicine." Ms. Lane tried to calm Groff. She heard Groff go into the kitchen and ask, "[W]hich one of you MF's took my pills, I know which one, I know somebody in here did it." Ms. Lane listened from the bedroom, and "it sounded like . . . , [Groff] was going around the table accusing everybody and threatening people because he wanted to know who took his pills and he was so sure that somebody in that room or in there took his medicine." She testified that Groff was "being irrational."

Ms. Lane heard Defendant tell Groff to leave, and she heard "a noise like a bump or something." She went into the kitchen and saw Groff pull Defendant up by his shirt and "thr[o]w him against the wall." Groff said, "[H]e took my medicine, I know he did." Ms. Lane told Groff that she did not believe Defendant would take his medicine. She "was trying to make him stop." Ms. Lane testified that Defendant's "face turned like pale white, like he couldn't breathe and he was gasping for air." Groff is taller than Defendant, and Defendant was unable to push Groff away. Groff then chased Defendant around the kitchen and shoved him into the cabinets. Groff picked up a fan, threw it at Defendant and was "banging him in the head with it." Ms. Lane told Groff to stop, and Groff grabbed her around the waist and pushed her. Ms. Lane testified that Defendant's face was red, but she did not see any bleeding or bruises. She testified that Defendant looked scared. Groff began "beating [Defendant] with the fan again" and grabbed Defendant by the throat. Defendant then stabbed Groff in the shoulder with a knife. Ms. Lane testified that Defendant also stabbed Groff "around his head area." Ms. Lane called the police. She gave the following statement to police:

> Me and [Groff] was [sic] coming home from the store. I was putting groceries away, when [Groff] called me in the bedroom[.] [H]e thought someone got into his bottle of medication.
>
> He counted [them, and] six were missing. He got very upset [and went] into the kitchen [where] my brother[-]in[-]law and son, his friend were sitting, asked them if any of them took his pills. They denied it.

[Groff] was ac[c]using them of being th[ie]ves and calling them names. I was trying to tell everyone to stop yelling and calm down. They wouldn't listen to me and wouldn't stop[.] [M]y son [Defendant] told [Groff] to leave his home. [Groff] said he didn't have to get out.

. . . . [Defendant] shoved [Groff], then [Groff] pulled [Defendant's] hair. They were both shoving, pushing, and I got in between the two of them. [Defendant] grabbed a knife, started stab[b]ing [Groff]. I thought it was around his eye area. [Defendant] was yelling[, "Y]ou leave my home, don't threaten my family.["] I was in shock.

Ms. Lane testified that she "was scared of [Groff]'s anger because he does have a temper." She testified that she "left some details out" of her statement because she "was in shock" at the time, and "everything happened so fast."

Derrick Groff testified that he was living with Ms. Lane at the time of the incident because his wife "had kicked [him] out" of their apartment. He testified that before they went to the grocery store, he counted his pills because he was suspicious that someone in the apartment was stealing from him. He then placed the pills back into the shoebox where he stored them and placed an old thermostat on top of the shoebox so he would know if it had been moved. When they returned, he saw the thermostat lying on the floor. He recounted the pills, and six were missing. He went into the kitchen and asked who had taken his medication, and everyone denied taking the pills. He accused Defendant of taking the pills, and Defendant "automatically got upset, jumped up, got in [his] face." Both men were yelling at each other, and Defendant told Groff to leave the apartment. Groff refused to leave without his "stuff."

Groff testified that he pushed Defendant, and Defendant picked up a knife from the kitchen sink. Groff testified that he was "in shock." Defendant was "kind of waving" the knife around, screaming at Groff to get out. Groff backed away and picked up a box fan. He held the fan by the handle and "was punching it at him." Groff wanted to "at least stun [Defendant] enough to where [he] could get the knife away from him and keep distance of course, you know." He testified that he swung the fan at Defendant "about four or five times," and the people in the apartment were screaming at him. He denied "bashing" Defendant with the fan.

Groff testified that he put the box fan down while Defendant still had the knife. Defendant turned his head, and Groff "jumped on him and [Groff] got him in a chokehold and [he] grabbed his arm and [he] took [Defendant] down." Groff "was just trying to get

- 3 -

the knife away from him." He testified that "[e]verybody" pulled him off of Defendant, and he and Ms. Lane went into the bedroom. Defendant followed Groff into the bedroom and said, "you ain't going to talk to my family like that." Defendant ran at Groff and struck him. Groff did not realize he had been stabbed. He thought Defendant was punching him. He felt blood running down his neck. He testified that Defendant stabbed him twice and attempted to stab him a third time, but Groff grabbed Ms. Lane, because he "figured [Defendant] wouldn't stab [him] if his mom was there." He testified that "[n]obody seemed to care" that Defendant was stabbing him. He testified, "everybody was still yelling at me, threatening to call the cops." Groff testified that he called 9-1-1. He had stab wounds to his left shoulder and the back of his head.

Groff testified that Defendant was standing about ten feet away from him when he grabbed the knife. He testified that Defendant did not advance toward him, and he acknowledged that he moved closer to Defendant to get the box fan. Groff then began "jabbing" the box fan at Defendant. He testified that he was afraid of Defendant, but he "wasn't going to leave without [his] stuff."

Eddie Key, of the Greeneville Police Department, responded to an assault at Crestview Apartments. When he arrived, he knocked on the apartment door, and Defendant answered. Officer Key observed a knife with blood on it on the kitchen table. He also observed that Groff had an injury to his neck. Officer Key took a statement from Trixie Lane. Officer Key testified that Defendant appeared "relatively calm."

Officer John Bishop also responded to the scene. He testified that when he arrived, Defendant answered the door and told police that Groff was in the bedroom. Groff walked out of the bedroom "covered in blood." Defendant admitted that he stabbed Groff, saying "'[Y]eah, I done it.'" Officer Bishop testified that Defendant and Groff began to argue. Officer Bishop and Captain Rednour handcuffed Defendant and led him out of the apartment. Officer Bishop testified that Defendant stated that he and Groff were arguing and pushing each other. Defendant claimed that he got a knife and told Groff to leave, that "he wasn't going to talk to his family that way." Officer Bishop testified that Defendant "was sporadic the way he was answering, he wasn't answering in sentences[. H]e was just blurting out stuff." Officer Bishop transported Defendant to the police station. Officer Bishop testified, "The whole time, he's muttering, you know, he's muttering 'he shouldn't have been there, he should have left, that was his family, you wasn't going to talk to his family that way, it was his right to bear arms.'" When they arrived at the police station, Defendant declined to give a statement. Officer Bishop did not observe any cuts, bleeding, or bruising on Defendant. He testified, "The only wound that I saw on him at the time looked like a thumbprint on his neck, what could be a thumbprint."

- 4 -

Captain Terry Rednour, of the Greeneville Police Department, testified that Defendant stepped out of the apartment when officers arrived and "made the statement, 'I stabbed him, he should have left, we tried to get him to leave.'"

Defendant testified that he was sitting at the kitchen table with his uncle, Scott Gregg, and his friend Chris McMahn, when his mother and Groff returned from the grocery store. He heard Groff in the bedroom "talking about somebody stole his pills." When Groff came out of the bedroom, he "was real aggravated, you can tell he was mad." Groff began pacing back and forth in the kitchen, saying "I want to know what MF'er took my medicine." Defendant testified that Groff "got right in [McMahn's] face." Groff then came over to Defendant and "started going off on [him]." Defendant told Groff, "[Y]ou are not going to stay here and treat my family like that, you are going to leave, you have to leave, you need to go." Groff refused to leave. Groff then grabbed Defendant around his throat, and they were "wrestling." Defendant testified that Groff was choking him. Groff then "slung" Defendant against a cabinet. Defendant grabbed a knife. He testified, "I wasn't trying to threaten him, like I wasn't trying to make him feel like I was going to hurt him, but I was letting him know that, you know, I am going to defend myself if I have to."

Defendant testified that Groff grabbed him and "turned the knife" on him, "trying to make [Defendant] stab [him]self." Defendant testified that someone pulled Groff off of him, and when Defendant stood up, Groff hit him with the fan several times. Groff was "whacking" him with it. Defendant testified, "I had to act, I had to stop him. He was going to hurt me bad." Defendant testified that he stabbed Groff once, and Groff threatened to "kill all you MF'ers" and called Defendant's aunt "the B word." Groff "noticed he was bleeding and it just made him even worse." Groff "came after" Defendant again, Defendant's aunt stepped between them, and Defendant reached around his aunt and stabbed Groff again. Defendant's aunt called the police.

Scott Gregg, Defendant's uncle, testified that Groff's demeanor was "fine" when he left with Ms. Lane to go to the store, and after they returned, Groff looked "demonic." Mr. Gregg testified that Groff "had this look in his eyes like he was, I don't know, like he was possessed or something." Groff was cursing and accusing everyone of stealing his medicine. Mr. Gregg testified that Groff and Ms. Lane were gone to the store for about 20 minutes. Mr. Gregg told Groff that none of them had moved from the kitchen table while they were gone. He testified that Defendant was smiling while playing a game on his phone, and Groff said, "'[Y]ou think this is funny, mother F'er" and accused Defendant of stealing his pills. Groff then grabbed Defendant "by the arm or the throat or the sides of the head" and lifted him out of his chair and threw him against the kitchen sink. Defendant stood up, grabbed a knife, and held it against his chest with the blade pointed down. Groff asked Defendant if he planned to kill him and then lunged at

Defendant and knocked him to the ground. Mr. Gregg testified that it looked like Groff was trying to make Defendant stab himself with the knife. Ms. Lane pulled Groff off of Defendant, and Groff grabbed a fan and "full speed [ran] toward [Defendant] and just start[ed] waylaying him in the face." Defendant stabbed Groff. Leoma Gregg saw Groff "beating [Defendant] down." Ms. Gregg said, "[Y]ou don't do my family like that." Groff yelled, "I'll kill every mother F'er in here." Mr. Gregg testified that Groff "was coming at [him and Ms. Gregg] with the fan still in his hand," and Defendant stabbed Groff a second time.

*Analysis*

Defendant argues that the trial court erred by denying his motions for a judgment of acquittal because he acted in self-defense. Defendant made a motion for judgment of acquittal at the close of the State's case-in-chief and again at the close of trial. "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address Defendant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of innocence and replaces it with one of guilt, so that the defendant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Assault, as is relevant to this case, occurs when one "[i]ntentionally, knowingly or recklessly causes bodily injury to another."  T.C.A. § 39-13-101(a)(1).  Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."  *Id*. § 39-11-106(a)(2).

Tennessee Code Annotated section 39-11-611(b)(1) provides that:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense.  *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001).  Whether the defendant acted in self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).  If the jury finds that the defendant acted in self-defense, it is a complete defense to crimes of violence.  *Id*.

Viewing the evidence in the light most favorable to the State, we conclude that a reasonable jury could have found Defendant guilty of assault beyond a reasonable doubt. This is a case of two competing narratives.  Groff testified that Defendant threatened and stabbed him with a knife, and he defended himself with a fan.  Defendant testified that Groff became violent, shoved and choked him, and beat him with a fan, and he used the knife to fend off Groff's attacks.  Defendant argues in his brief that the testimony of all the witnesses except the victim was that Defendant acted in self-defense.  However, the jury was free to reject this testimony.  Juries are tasked with assessing the credibility of trial witnesses and are generally free to reject, in whole or in part, the testimony of any witnesses.  It is the province of the jury to assess the credibility of the witnesses, weigh the evidence, and resolve disputed issues of fact.  *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004).  The evidence is sufficient to support Defendant's conviction for assault.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE