IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 3, 2008

**STATE OF TENNESSEE v. DAMIEN CLARK**

**Appeal from the Criminal Court for Shelby County**
**No. 05-04275     Carolyn Wade Blackett, Judge**

---

**No. W2007-00651-CCA-R3-CD  - Filed April 1, 2009**

---

The defendant, Damien Clark, appeals from his conviction by a jury in the Criminal Court for Shelby County for second degree murder, a Class A felony. He was sentenced to twenty years' confinement as a violent offender. He contends that (1) the evidence was insufficient to support a conviction for second degree murder, (2) the trial court erred in admitting the defendant's prior robbery conviction as character evidence, (3) the trial court erred in admitting the defendant's prior robbery conviction when the probative value was outweighed by its prejudicial effect and notice of impeachment was "inadequate and inaccurate," and (4) the jury instructions requiring the jury to acquit the defendant of second degree murder before examining voluntary manslaughter as a conviction offense deprived the defendant of his constitutional rights to due process and to trial by jury. Although the required procedure was not used to admit the defendant's prior conviction, we conclude the errors were harmless, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Leslie I. Ballin, Memphis, Tennessee, for the appellant, Damien Clark.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Senior Counsel; William L. Gibbons, District Attorney General; and Dennis Ray Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Toneyce Green testified at trial that she and the victim, Demetrius Green, were married but separated on January 19, 2005, the date of the fatal shooting. She said the victim's nickname was "Petie."

Jerry Wayne Fraser testified that on January 19, 2005, he and his brother drove to a house on Braden Street to repair a broken door. He said that they arrived around midday and that the front

door had been kicked in. He said the person waiting for them told them to use the side door because the first door was inoperable. He said that he had not previously seen the person who waited at the house for them and that this man introduced himself to them as "Pee Wee." He said he and his brother left to obtain repair parts. He said that upon their return, his brother parked the car in the driveway of the house next door, as this was the closest area to the door for them.

Jerry Fraser testified that as he was finishing the repairs and picking up his tools at the house's porch, a white van drove up. He said he heard the beginning of an argument approximately fifty to seventy-five feet away from him in the driveway and street in front of the house where he had been working. He stated that when he looked up, one of the two people in the dispute seemed to have just gotten out of a white van and was walking down the street a few feet away from the van. He said the defendant also walked into the street and, in a loud voice, told the man from the white van that he had said not to return and asked him where his items were. He stated the man from the white van continued to walk down the street. He said he looked down to pick up his tools. He said that he next heard a "little bitty pop," that he heard the next-door neighbor swear, and that he then realized a shooting had just occurred. He stated that he looked up and saw the defendant holding a gun high above his head. He said the defendant walked across the yard. Fraser said that both he and his brother got into their truck and drove away. He said that the shooting took place behind a Thunderbird parked in front of the white van. He stated that he later identified the defendant in a photographic lineup as the man who held the gun on January 19, 2005, at the house on Braden Street. He stated that although he needed his reading glasses to testify to the date he had written on the photographic lineup, he did not need corrective lenses to see anything else.

On cross-examination, Jerry Fraser said that he saw the defendant holding the gun above his head but that the Thunderbird blocked the other man from his view. He stated that he did not see the victim when the gun went off. He said he instead heard the gun fire. He stated that people were coming and going at the house while he had been repairing the door and that other people, including his brother, were outdoors at the time of the shooting.

David Michael Fraser testified that he was the brother of the repairman, Jerry Wayne Fraser, and that he accompanied him to Braden Street on January 19, 2005. He said he drove his brother to the house. He said that he parked the truck in the house's driveway and that the passenger door was closer to the house. He said that he had previously seen the house's tenant, who was not there when they arrived. He said he did not remember going into the house but that he remembered standing at his truck outside the house with his back to the street. He said that he heard a loud conversation behind him in which the defendant asked another man where his items were and the other man denied having them. He said he did not see the men at this time. He said that he heard a "pop" and that he then saw the defendant walking back to the house.

On cross-examination, David Fraser disputed that he and his brother left the house to obtain repair parts. He said he did not remember seeing the defendant hold a gun while walking back to the house. He said he and his brother were simply trying to leave.

Dock Millen testified that he was standing on the sidewalk across the street from the shooting. He said he was a friend of the victim, whom he knew as "Petie." He said he saw Petie get

out of a white car and walk down the street. He said the defendant walked from his house into the street and called Petie to him. Millen stated that nothing obstructed his view of the shooting and that a white car was to his right. Millen said that the defendant "threw [his] arm around Petie['s] shoulder" and accused Petie of having broken into his house. He said that although Petie denied the loud accusation, the defendant persisted in saying he did so because he had heard that Petie had been there. Millen stated the defendant then drew a gun and shot him. He said that before the shooting, Petie had his hand in his pocket. He claimed it did not look as if Petie had a weapon.

On cross-examination, Millen agreed that he had spoken with police after the shooting, but he disputed that he had been drinking whiskey the day of the shooting. He denied having said he had been drinking the day of the shooting, he denied that the written statement saying he had been drinking was his own statement, and he denied that the voice answering a detective's questions on an audiotape was his. He continued to deny that Petie had a weapon in his pocket, but he later acknowledged that he only knew Petie did not display a weapon.

The Shelby County Medical Examiner, Karen Chancellor, M.D., testified that she performed an autopsy on Demetrius Green on the day of the shooting. She said the body measured five feet, eight inches, and weighed 151.5 pounds. She stated that a bullet penetrated the victim's clothing and entered the body on the right side of the chest. She said she found gunpowder flakes on the clothing, which indicated that the gun barrel had been very close to the body when the gun had fired. She said that the skin around the round wound site was seared by the bullet's entry into the body. She stated this was a further sign that the gun was fired at close range. She opined that the gun was fired one to two inches away from the victim's body. She said that test firing of "the actual weapon" would reveal more precisely how far away the gun was from the body when it had been fired. She said this gunshot wound to the chest caused the victim to bleed to death. She stated that when the corpse arrived at the forensic center, it held a cigarette between two fingers of its right hand and that she found a folding knife in the pocket of the victim's jeans.

On cross-examination, Dr. Chancellor testified that she took a blood and urine sample from the victim. She said that although the victim had no alcohol in his blood, he did have the "breakdown product[s]" of both marijuana and cocaine in his blood sample. Dr. Chancellor said that in his urine sample, however, the victim had the breakdown products of marijuana and cocaine, undigested cocaine, and cocoa ethylene, a substance formed when alcohol is consumed with cocaine. In view of these found substances, Dr. Chancellor stated that the victim had consumed cocaine anywhere from several hours before the shooting to two days before the shooting. She stated that the bullet lodged in the victim's left lower back was fired from a medium-caliber gun. She stated that to inflict this wound, a gun would have to be fired at a downward angle one to two inches away from the victim's body.

Shelby County Sheriff's Officer Jack Dallosta testified that he was the first officer to respond to a dispatch about the shooting on January 19, 2005. He stated when he arrived at 5256 Braden Street, he saw the victim lying face down in the street and a crowd of between fifteen and twenty people. He said that he moved back the crowd and that he found no pulse in the body. He acknowledged that he had not been at the scene at the moment of the shooting, but he stated that the

photographs of the crime scene, including a photograph of the victim holding a cigarette in his right hand, accurately reflected the location when he arrived.

Lieutenant John Mills of the Shelby County Sheriff's Office testified for the defense that he had investigated the January 19, 2005 shooting and that he had questioned Dock Millen the afternoon of the shooting. He stated that he remembered Dock Millen told him that he had drunk whiskey that morning. Lieutenant Mills identified both his and Millen's voices on a taped recording of the interview. He stated that both the interview tape and his incident report reflect that Millen had said he had drunk whiskey earlier that day. On cross-examination, he acknowledged that he asked all interviewees whether they were under the influence of drugs or alcohol and that he had no reason, at the time of the interview, to suspect that Millen was intoxicated. He emphasized that he did not ask Millen whether he was under the influence when he observed the shooting. When the defense recalled him, Lieutenant Mills testified that the pocket knife the medical examiner found in the victim's clothing measured approximately four inches when closed and seven inches when extended.

Louis Coffee testified that his nickame was "Pee Wee." He said he had known the defendant at the time of trial for approximately two years. He said that the defendant "used to mess around" with his sister, Lawanda Rogers. He said that on January 18, 2005, he, the defendant, Dock Millen, the witness's sister, Lawanda, and a man named "Dirty" were talking outside the defendant's house when they heard a window in the defendant's house open and other noises. Coffee said he ran to the side of the house to see two people jumping a fence. He said he chased the men. He said that the defendant started to give chase but that he decided against it given the tall fence. Coffee said he fell after hopping the fence but that he saw the face of one of the men he was pursuing and recognized Petie. He said he returned to the house, where he told the defendant he had seen Petie. He said that the house had just been burglarized and that he saw that the television had been placed on the couch. Coffee said he called the police. He stated that he was a carpenter and that he tried to stabilize the broken front door for the night. He said he did not speak with the police when they arrived. He said that when he drove his girlfriend, Dee, to the house later that night, he also brought a gun with him. He stated that he, Dee, and the defendant spent the night in the house after the burglary.

Coffee testified he stayed at the house the following day, January 19, to receive the repairmen for the door. He said they arrived, left to get a part, and then returned. He said he had been falling asleep. He said that Dock was there briefly and that Lawanda and Dee were both still at the house at the time of the shooting. He stated that he was dozing off while the repairmen were there and that he awakened to a loud noise outside the house. He said that he came to the front doorway and that he saw the defendant and Petie standing "sideways" outside. He claimed that nothing obstructed his view. He said that after the defendant and Petie said "What" reciprocally, Petie "went in his pocket . . . to like pull something out." He said the defendant then drew his gun and shot Petie. He stated that he went inside to get his sister and girlfriend after he heard the gunshot and that the three of them went to his mother's house. He said the defendant's attorney spoke with him on the telephone later that day and that the attorney told him to go to the sheriff's office. Coffee stated he did not speak with the defendant again before he went to the sheriff's office, where he said he identified the shooting victim from a photographic lineup.

On cross-examination, Coffee explained that because he was trying to secure the door, he did not talk to the police on the night of the burglary to tell them that Petie had broken into the house. He said that he brought the gun to the house after the burglary to protect himself and that he had not had it when he was chasing Petie and the other burglar. He said that although he had the gun close to him that night for protection, he placed it under the closet rug the following day before the repairmen arrived. He said he did not take it with him when he and the two women left the house immediately after the shooting. He said that the loud voice he heard shortly before the shooting saying "What" was Petie's. He said that given his unobstructed view, he could see both of Petie's hands and that Petie did not hold a cigarette at the time. Although he could not remember which hand Petie used, he did remember that Petie jerked his hand to his pocket. To refute the defense's claim that he was biased in favor of his friend, the defendant, Coffee said both the defendant and Petie had been his friends. He stated that the gun he saw the defendant use was not an automatic pistol, unlike the gun he hid in the closet.

On re-direct examination, Coffee testified that he did not talk with the defendant before the witness gave the police his statement. He also confirmed that Petie's hand had been outside the pocket before he put it into his pocket. He stated he never told the defendant about his gun or that he had hidden a gun in the defendant's house.

Damien Clark testified that he was twenty-six at the time of trial. He acknowledged having felony convictions for robbery (at age fifteen), the attempted possession of a controlled substance with intent to sell, and possession of a controlled substance with intent to sell. He stated he shot Petie on January 19, 2005. He said that he "knew of" Petie but did not know him. He said that he had given him a ride once and that Petie would come to his front yard. He said Petie had even been in his home watching a domino game. He also said he did not know Petie's full name.

Clark testified that he had been living in his home at 5256 Braden Street approximately two months when on January 18, 2005, he, his girlfriend Lawanda, and Pee Wee were talking in the front yard after having returned to the house. He said he and Louis Coffee ran to investigate a noise coming from the side of the house. He stated he saw one person coming out of the window and another who had already cleared the window. He said these two men ran through or over two fences in the neighbor's back yard. He said that while Louis Coffee was able to pursue the men over the second of these fences, he could not due to the fence's height. He stated that he returned to his house to inspect it and that the front door had been kicked in. He said that items had been "bagged up" in sheets and blankets and that his watch and some money were missing.

Clark said that when Louis Coffee returned, he told the defendant that he had seen the burglars nearby and that they should drive to confront them. He stated that Louis Coffee had told him he had seen Petie's face when he almost caught up to him. He said that they rode around for a while but did not find the burglars. He said that when they returned to his house, he called the police and his landlord, who said repairmen would be there the next morning. He stated that his friend went to get his girlfriend and that all three of them spent the night in the house after the burglary. He said he did not know about Louis Coffee's weapon at that time. However, he did say that later that evening, while Louis Coffee was picking up his girlfriend, he stood in the doorway of his house and talked with a man in the street, who had heard about the burglary. The defendant said

this person offered to sell him a gun. He admitted purchasing the gun and said he put it in his jacket pocket.

Clark said that he wore the jacket the next morning while it still contained the weapon. He said Lawanda picked him up in Louis Coffee's van and parked in the street. He said Lawanda's own car was still parked in the driveway, where she had parked it the previous day. He said there was space between the van and the parked Thunderbird. He said that he talked briefly with two men nearby and that he then walked to his porch. He said that when he had almost reached the porch, a "loud car" drew his attention to the street. He said that Petie got out of this car. He said that at that point, he told Louis, asleep on the couch, that Petie was back. He stated that he walked off the porch to go "confront" Petie about the burglary. He said the two men met at the end of the driveway. He said the victim acknowledged him, saying, "What's up." The defendant said he responded by saying that Petie already knew what had happened and that the defendant wanted his items back. The defendant claimed Petie's demeanor became hostile. He estimated he and Petie were two feet apart at this time. He said that Petie's hands were at the level of his pockets but that they were still outside the pockets. He claimed Petie began to say "Bitch" and to reach for something inside his pocket. The defendant stated that although he was larger than Petie, this sudden reaching scared him. The defendant stated he thought Petie had a gun in his pocket. He said he could not remember which hand Petie used in this sudden movement. He said that he was scared and that he thought his life was "in jeopardy." The defendant stated he pulled the gun out of his jacket pocket and shot Petie once. He said that he did not check on Petie and that he did not call the police. He said he called his attorney later that day and that counsel told him to come to his office. The defendant said he and counsel went to the sheriff's office, where the defendant said he truthfully recounted the events in a recorded statement. He stated that he did not remember Petie having a cigarette in his hand during their confrontation. He said he just remembered seeing Petie move his hand in a way that looked as if he had been reaching for a weapon.

On cross-examination, Clark said he accidentally took the gun with him in his right pocket that day. He said he was right-handed. He admitted, however, that he knew he had the gun in his pocket when he confronted Petie in the street. He stated that Petie's hands were in his jacket pocket instead of outside the pockets. He said that Petie reached for his pants pocket in a sudden way. He said he shot Petie while Petie's hand was still in the pants pocket. He said he shot Petie because he thought Petie was going to shoot him and not because of the previous night's burglary.

On redirect examination, Clark reiterated that he shot Petie because he feared for his own life. He said he confronted Petie because he wanted to have his property returned. On recross-examination, the defendant explained that it was Petie, and not he, who changed the tenor of the conversation. The defendant denied that he was a "hostile" person.

Toneyce Green testified again, this time for the defense, that she and Petie had a violent marriage. She said he would become angry and violent when he abused drugs and alcohol. She stated that there were too many instances of him physically hurting her for her to keep track of them. She admitted, for example, that he kicked her in the stomach when she was four-and-one-half months pregnant; that he had beaten her face with a gun; that after an argument he had thrown a brick into her windshield when she was driving, an incident requiring her to get medical attention

for a shard of glass in her eye; and that after another argument he had kicked in the windshield of a car in which she was a passenger. She stated that she had obtained an order of protection against him.

Amanda Millington, a clerk with the Criminal Court Clerk's Office, testified that Demetrius Green had been convicted of reckless aggravated assault and robbery and that he had received two- and three-year sentences, respectively.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence does not support a conviction for second degree murder, arguing that the facts justify only a voluntary manslaughter conviction. The State responds that the evidence suffices to convict the defendant of second degree murder. The State argues additionally that the evidence did not present a reasonable doubt that the defendant's actions were criminal, as required by State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The State also asserts that the evidence did not show the defendant acted in a state of passion after adequate provocation and thereby precludes a voluntary manslaughter conviction.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

We conclude the evidence was sufficient to convict the defendant of second degree murder, "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1) (2003). The evidence showed that the defendant thought the victim had burgled his home the night before the killing. His friend, Louis Coffee, had told him the victim was one of the men fleeing the defendant's home. The defendant purchased a handgun, apparently loaded with bullets, shortly after this burglary. Armed with a loaded handgun, the defendant saw the victim the next day in front of his home. The testimony reflects that he walked from his front door to the street to confront the victim. The evidence showed that the defendant was larger than the victim, who was five feet, eight inches and weighed 151.5 pounds. The defendant called the victim to him and asked the victim where his missing items were. Despite the victim's claims of innocence, the defendant continued to assert that the victim had burgled his home. The defendant pulled his gun from his right jacket pocket and shot the victim when the two men were one to two inches apart. The evidence showed that the victim held a lit cigarette in his right hand when he was shot and that he died from this single gunshot at close range. We conclude that the defendant was aware that firing the gun at the victim's chest when they were one to two inches apart "[was] reasonably certain to cause" the death of the victim. See T.C.A. § 39-11-106(a)(20) (2003) (defining "knowing"). The defendant is not entitled to relief.

## II. ADMISSIBILITY OF PRIOR FELONY CONVICTION TO

## DEMONSTRATE CHARACTER AND TO IMPEACH (ISSUES 2 AND 3)

The State filed a Notice of Impeachment Convictions, which it claimed included aggravated robbery. The defense objected to the admission of this crime, arguing that the conviction offense was "robbery" instead of "aggravated robbery" and that the crime was too old to be considered under Rule 609 of the Tennessee Rules of Evidence because the conviction date fell outside the ten-year window for crimes not involving dishonesty. In a jury-out hearing, the court determined that the defendant had received a six-year sentence on probation for robbery on November 17, 1995. The court held that according to Rule 609(b) of the Tennessee Rules of Evidence, the ten-year period should be "measured from the date of conviction" for sentences not involving confinement, i.e., November 17, 1995. The end of the ten-year period would have been November 16, 2005. The indictment was returned on June 30, 2005. The court found that the robbery conviction met the time requirements of Rule 609.

The defense objected to the notice of impeachment convictions, which it claimed was both "inadequate and inaccurate" because the robbery conviction was incorrectly stated as "aggravated robbery." The court held that the remedy for a flawed written notice of a conviction was a motion to continue to gain time in which to prepare a rebuttal to the evidence of the conviction. The defense responded that it was prepared to rebut the claimed conviction. The court found that pre-trial notice was not "specifically required" by Rule 609, and the court stated that because robbery is a lesser included offense of aggravated robbery, the conviction listed on the State's notice, the defense had prior notice of that conviction. Also, in view of the defendant's criminal history, the court ruled that the probative value of the impeaching crime outweighed any unfair prejudicial effect on the case's substantive issues. See Tenn. R. Evid. 609(a)(3).

The defendant admitted early in direct examination that he had prior convictions for robbery, attempted possession with intent to sell a controlled substance, and possession of a controlled substance with intent to sell. The character issue arose on cross-examination when the State asked the defendant about his claim that the victim's demeanor changed when the defendant confronted him about the burglary:

> Q: When did you notice that [the victim] got hostile?
> A: When I asked him about breaking in my house.
> Q: When you were right up in his face?
> A: We was pretty close then, we wasn't right in each other's face at that time.
> . . .
> Q: You were asking him nicely, please give me my stuff back?
> A: No.
> Q: Right, you weren't were you?
> A: No. I wasn't listening in those terms and I wasn't acting in a hostile term.
> Q: You weren't upset at all?
> A: I'm not just that type of person to get just hostile like that.
> Q: You're not a hostile person?

A: No.

Q: Well, you just told your attorney that you're the same person
who was convicted of Robbery.

The defense objected to the State's last statement. In a jury-out hearing, the defense said it had not put the defendant's character into issue. The defense also stated that the robbery conviction occurred when the defendant was fifteen years old and would be excluded under Rule 608(c) as a specific instance of conduct as a juvenile. This rule states that evidence of specific instances of conduct may be introduced for witnesses other than the accused. Finding that admission of the crime was not "necessary for a fair determination in a . . . criminal proceeding," the court stopped the line of questioning to prevent the State from asking about the facts of the robbery conviction. Tenn. R. Evid. 608(c). The court noted that the defendant had already admitted the robbery conviction before cross-examination. It further noted that the State wanted to ask about the robbery conviction to show that the defendant had the character trait of hostility, to which the State agreed. The court allowed the State to ask the defendant if he was the person convicted of the robbery listed in the 1995 indictment. The defendant said he was that person.

## A. 404(b) Determination

The defendant contends that the trial court erroneously admitted the defendant's prior conviction for robbery as Tennessee Rule of Evidence 404(a) character evidence when the State asked the defendant on cross-examination whether he was a "hostile person." The defendant claims that for the State to rebut the defendant's purported character claim of non-hostility, the defendant must first put his character into issue. State v. West, 844 S.W.2d 144, 149 (Tenn. 1992). The State argues that its mentioning of the defendant's conviction for robbery was proper because the court did not allow the use of the conviction as character evidence but instead permitted only a question on whether the defendant had this conviction.

Tennessee Rule of Evidence 404(a) states that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except [that the accused may introduce evidence] of a pertinent character trait." Tenn. R. Evid. 404(a)(1). Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait" but that this evidence may be used for other purposes. The rule lists four requirements that must be satisfied before a court determines admissibility:

(1) [t]he court upon request must hold a hearing outside the jury's presence;
(2) [t]he court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) [t]he court must find proof of the other crime, wrong, or act to be clear and convincing; and

-9-

> (4) [t]he court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). If the court did not substantially comply with the procedure, its decision is not entitled to deference by the appellate court. See id. at 653.

In the present case, the trial court did not substantially comply with the procedures of Rule 404(b), and we evaluate the admission of the evidence de novo. See DuBose, 953 S.W.2d at 653. The trial court did not determine that "a material issue existed other than conduct conforming with the character trait of hostility." Tenn. R. Evid. 404(b). Looking at the jury-out hearing, we conclude that the State was attempting to use a prior wrong or act (the defendant's conviction for robbery) to prove character in conformity—that is, that the defendant was "hostile" then and now. This is precisely what Rule 404(b) prohibits. However, any error in this may be deemed harmless, as the jury had already heard the defendant admit his prior robbery conviction during direct examination, where he also admitted having shot the victim. The court also limited the State's use of the prior conviction by not permitting it to inquire into the facts of the conviction and allowing it to ask the defendant only whether he was the person convicted of robbery in a specific indictment number. The defendant has not shown that the error more probably than not affected the result in view of the evidence against him, including his own admission that he shot the victim. T.R.A.P. 36(b). The defendant is not entitled to relief on this account.

## B. 609 Determination

The defendant argues additionally that Tennessee Rule of Evidence 609 precludes the admission of this conviction because the probative value of the conviction was outweighed by its possible prejudicial effect. He claims that the impeachment crime, robbery, has little relevance to credibility and that robbery and second degree murder are both assaultive offenses, thus rendering them too similar to be admissible. The State replies that the trial court did not abuse its discretion in admitting the conviction to impeach the defendant because the conditions of Rule 609 have been satisfied.

Pursuant to Tennessee Rule of Evidence 609, the credibility of the accused may be attacked by presenting evidence of prior convictions. The prior conviction must be for an offense punishable by death or imprisonment in excess of one year or for a crime involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Less than ten years must have elapsed between the date the accused was released from confinement and the commencement of prosecution. Tenn. R. Evid. 609(b). Also, the State must give reasonable written notice of the impeaching conviction before trial, and the trial court must find that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. Tenn. R. Evid. 609(a)(3).

The fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion. State v. Miller, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). The trial court must analyze the relevance that the impeaching conviction has to the issue of credibility and then assess the similarity between the crime on trial and the crime underlying the impeachment conviction in balancing the probative value on credibility against its unfair prejudicial effect on the substantive issues. See State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999); State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992). The trial court's decision to allow the prior convictions under Rule 609 will not be reversed on appeal unless the trial court abused its discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

The trial court made no finding regarding the similarity between robbery and second degree murder as it was required to do by Farmer. 841 S.W.2d at 839; see also Mixon, 983 S.W.2d at 674-75. The court merely stated that in view of the defendant's other convictions, it could not find that the probative value of the conviction would be outweighed by any unfair prejudicial effect. Because the trial court failed to follow the criteria of Rule 609 and the Farmer line of cases construing this evidentiary rule, we will review the admission de novo.

In the defendant's case, several conditions of Rule 609 have been satisfied: a crime of dishonesty, less than ten years have elapsed since the date of conviction, pursued during cross-examination, and written notice. The only issue for us to determine is whether the trial court properly admitted the conviction for impeachment after balancing the probative value on credibility against its unfair prejudicial effect on the substantive issues. Farmer, 841 S.W.2d at 839.

The defendant was impeached in a second degree murder trial by his prior robbery conviction. In Tennessee, robbery is a crime of dishonesty. State v. Galmore, 994 S.W.2d 120, 122 (Tenn. 1999). As such, it is highly relevant to the accused's credibility at trial. State v. Blevins, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997) (holding that robbery conviction was crime of dishonesty and "len[t] greater weight to . . . probative value regarding credibility").

Regarding the similarity between the crime being tried and the impeachment conviction, our supreme court has stated

> When an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged. Accordingly, the unfairly prejudicial effect of an impeaching conviction on the substantive issues greatly increases if the impeaching conviction is substantially similar to the crime for which the defendant is being tried. Therefore, trial courts should carefully balance the probative value of the impeaching conviction on credibility against its unfairly prejudicial effect on substantive issues.

Mixon, 983 S.W.2d ast 674 (citations omitted). In the defendant's case, the crimes are sufficiently different, such that a minimal likelihood existed the jury would use the impeaching conviction as propensity evidence against the defendant. See State v. Marty Lavern Pyburn, No. M2003-01090-CCA-R3-CD, Marion County, slip op. at 13 (Tenn. Crim. App. Aug. 16, 2004) (citing State v. Jeffery Jermaine Hankins, No. 02C01-9806-CC-00170, Madison County, slip op. at 16 (Tenn. Crim. App. Aug. 4, 1999) (concluding that "aggravated robbery . . . [was] not so similar to the offense of murder second degree as to compel finding of prejudice")).

Balancing the substantial relevance the impeaching conviction has to the defendant's credibility against its small risk of unfair prejudice to the substantive issues, the prior conviction was properly admitted, notwithstanding the trial court's failure to follow Farmer. The defendant is not entitled to relief.

The defendant claims he did not have "accurate and timely notice" of the impeaching conviction. We disagree that he did not have "reasonable written notice" as required by Tennessee Rule of Evidence 609(a)(3). The State provided the defendant with written notice of impeachment convictions approximately one week before trial. The notice provided a case number, date of the offense, sentence length, and court, each of which was correct. The defendant acknowledged in a jury-out hearing that he did not require time to prepare a rebuttal to the robbery conviction, although the conviction offense was erroneously listed as aggravated robbery. We conclude the notice complied with Rule 609(a)(3) because the State filed a specific written notice of intent to impeach using the defendant's prior convictions. State v. Barnard, 899 S.W.2d 617, 622 (Tenn. Crim. App. 1994) (holding that the State's discovery response listing accused's criminal record and failure to file notice of intent to impeach using these convictions did not comply with the prior written notice requirement). The defendant is not entitled to relief.

### III. JURY INSTRUCTIONS (ISSUE 4)

In a jury-out hearing, the defense objected to the jury instruction on homicide claiming that because voluntary manslaughter has an element (passion based on legally adequate provocation) not common to second degree murder, the use of a sequential jury instruction would allow the jury to convict for second degree murder before it considered the extra element of voluntary manslaughter. The court ruled that the instructions specified the difference between second degree murder and voluntary manslaughter and did not need to be considered in isolation. The defendant also included this issue in his overruled motion for new trial. However, his proposed jury instruction was not included in the appellate record.

We note the instructions for second degree murder and voluntary manslaughter shared the following language: "[t]he distinction between Voluntary Manslaughter and Second Degree Murder is that Voluntary Manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." The court then instructed the jury to consider the charged offense of second degree murder. If the jurors found the defendant guilty of that offense beyond a reasonable doubt, they were instructed to return a guilty verdict. If they found the defendant not guilty of second degree murder, they were instructed to

acquit the defendant on that charge and to consider the lesser included offense of voluntary manslaughter, following the same procedure to convict or to acquit and to proceed to the next lesser included offense.

The defendant claims that by requiring the jury first to acquit of second degree murder before it could consider voluntary manslaughter, the jury instructions violated the defendant's federal and state rights to due process and to trial by jury. He claims the "acquittal first" instructions failed to submit the legal issues fairly and misled the jury. He claims that remedies already adopted by other states' appellate courts would protect the criminal accused's due process and trial by jury rights in Tennessee: (1) requiring the State to prove the lack of legally adequate provocation when the evidence might require a voluntary manslaughter instruction, and (2) including a section explaining the element of passion arising from legally adequate provocation.

The State responds that the trial court properly instructed the jury. The State asserts that our supreme court has approved sequential jury instructions in State v. Mann, 958 S.W.2d 503, 521 (Tenn. 1997), and subsequent cases. The State argues the jury was not precluded from considering voluntary manslaughter during its deliberations on second degree murder, the charged offense, because each charge included the distinction between second degree murder and voluntary manslaughter. It claims the trial court instructed the jury "on the individual elements of each offense before instructing the jury on the manner of its deliberations."

Our supreme court recently held that sequential jury instructions satisfy a defendant's article I, section 6 of the Tennessee Constitution right to trial by jury, including the right to have instructions on charged and lesser included offenses and the right to a unanimous jury verdict. State v. Davis, 266 S.W.3d 896, 905 (Tenn. 2008). Also, as the State asserts, the trial court's instruction regarding second degree murder noted the distinction between voluntary manslaughter and second degree murder relative to voluntary manslaughter requiring a killing resulting "from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." We conclude that the instructions as given, requiring sequential assessment of the offenses, did not violate the defendant's rights to due process and to trial by jury and were sufficient for the jury to consider second degree murder in relation to the requirements for voluntary manslaughter.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-13-