# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned On Briefs April 23, 2013

## STATE OF TENNESSEE v. STANLEYABERNATHY JAMES

**Appeal from the Criminal Court for Knox County**
No. 93222   Mary Beth Leibowitz, Judge

---

**No. E2012-01912-CCA-R3-CD - Filed August 29, 2013**

---

The Defendant, Stanley Abernathy James, was convicted by a Knox County Criminal Court jury of second degree murder, a Class A felony, for which he is serving a twenty-five-year sentence. In this appeal, the Defendant contends that the evidence is insufficient to support his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Joseph Liddell Kirk (on appeal) and Bruce E. Poston (at trial), Knoxville, Tennessee, for the appellant, Stanley Abernathy James.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Eugene Nichols, District Attorney General; and Kevin James Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the shooting death of Henry James. At the trial, Nyron Roberts, a resident of Miami, Florida, testified that in May 2009, he came to Knoxville to visit friends and family and stayed for about three months. He said that when he arrived, he was already acquainted with the victim and the victim's brother, Myron James. He said he met the victim through Emmanuel Cooper.

Mr. Roberts testified that he and the victim were arrested on May 20, 2009, and that he pleaded guilty to a felony related to selling drugs and served about three months in jail. He admitted he had guns when he was arrested. He said that he had since returned to Miami

and was studying to become an electrician. He said that before his guilty plea, he had been released on bond. He said that his bond conditions allowed him to go to Miami but that he stayed in Knoxville with the victim's girlfriend's sister, Ronica. He said Ronica's home was not in Western Heights, a housing project. He said that neither he nor the victim had a car and that they rode with Myron James. He said that he did not pay any household expenses and that he was just "hanging out" the week before the victim's death.

Mr. Roberts testified that he was not concerned when he heard that the victim might post bond. Mr. Roberts said that his own bond was $15,000 and that he had to pay $1500 to be released. He admitted that he identified his drug supplier when he was questioned after his arrest. He said his identifying his supplier was not known in Western Heights. He said that after his release in July 2009, "MJ," Mr. Cooper, and he spent time at Elander "ET" Mathis's apartment on Virginia Avenue.

Mr. Roberts testified that on August 4, 2009, Myron James took Mr. Cooper and him to Ms. Mathis's apartment. He said Jonathan Jones was at the apartment. He said he was at Ms. Mathis's apartment three or four days that week. He said that on August 4, he knew the Defendant as "Sosa" and that the Defendant lived near Ms. Mathis but that he had not had any prior communications or dealings with the Defendant. He said that around 9:00 p.m., he answered Ms. Mathis's door when the Defendant knocked. He said he opened the inside door about half way but did not open the screen door. He said the door opened to the inside. He said that the Defendant greeted the victim and that the victim went to the door and talked to the Defendant, although he could not hear their conversation at first. He recalled, though, that the Defendant asked to come inside and smoke drugs with them. He said they did not allow the Defendant inside because it was not their house and Ms. Mathis had gone to the store. He said the Defendant stated loudly that he was unaware Mr. Roberts and the victim had been released from jail quickly and that he thought they were "snitchin' on somebody." He said the victim denied the accusation. He said he heard two shots, felt something hit his leg and burn, and jumped to the side of the couch. He denied that the victim had a gun in his waistband. Mr. Roberts said that he would have known if the victim had a gun and that the victim had been released from jail a day earlier. He denied that any money changed hands or that marijuana was being sold from the apartment.

Mr. Roberts testified that after he heard the shots, he saw the victim's chest smoking and the victim fall to the floor. He said he crawled to the victim and slammed the door. He said that the victim grabbed his hand and put it near the victim's chest wound and that he applied pressure to the wound. He said that he pulled the victim toward the back of the apartment and that the victim was unable to speak. He said he and Mr. Jones did not call 9-1-1 because they did not know the address but that Ms. Mathis and Myron James returned to the apartment and that Ms. Mathis called 9-1-1. He said that they were concerned an

ambulance would not arrive quickly, that they began getting the victim outside to take him to a hospital themselves, and that they had reached the outside steps when the ambulance arrived. He said he saw the victim's girlfriend leave the scene in a van while the victim's body was still there.

On cross-examination, Mr. Roberts testified that he had not known the Defendant before he came to Knoxville in May 2009 and that they met through Mr. Cooper, his best friend from Miami. He said the victim was Mr. Cooper's half brother.

Mr. Roberts testified that people slept overnight at Ms. Mathis's apartment. He said people also stayed at an apartment on Jourolman Avenue that was behind Ms. Mathis's apartment. He admitted that he and the victim had been arrested in the Jourolman Avenue apartment and that a large amount of crack cocaine and several firearms were found there. He denied that he had any of the guns on his person. When asked if the weapons were the victim's, he said, "No, I'm not saying that." He said Steven Cooper was arrested with them. He thought the victim's bond was $125,000. He said the Defendant was not involved in any business with them.

Mr. Roberts testified that after the victim was shot, Mr. Jones was inside the kitchen crying or panicking. He said Mr. Jones did not help them move the victim until Myron James returned. He denied that the police had to stop him from going in and out of the apartment and said that he was put into a police car.

Mr. Roberts testified that before the Defendant accused the victim of snitching, the Defendant said he wanted to buy marijuana. After having his recollection of his prior testimony refreshed, he agreed that he had said the screen door was unlocked. He agreed the Defendant never came inside the apartment.

Myron James testified that he was from Miami and came to Knoxville in 2007 for technical school. He said the victim was his brother. He said the victim came to Knoxville a few weeks after he did. He agreed that his brother and Nyron Roberts had trouble in May 2009, for which they were in jail until August 2009. He said the victim's girlfriend picked up the victim at the jail when the victim was released.

Mr. James testified that he and the victim spent the victim's last day together. They ran errands and eventually went to Ms. Mathis's apartment to "play around and make a little music" with Mr. Jones, who lived two doors down. He said that he and Ms. Mathis left the apartment to purchase sodas and cigarettes and that the victim, Nyron Roberts, and Mr. Jones stayed at the apartment to watch television. He said that the market was around the corner and that they were gone about five minutes. He said that when they left the apartment, he

saw "Kim" and Kim's son, who were going to the store, get into a van. He said Kim was the Defendant's girlfriend. He agreed people were walking around outside.

Mr. James testified that in August 2009, he knew the Defendant as "Sosa." He said he did not know the Defendant except as a neighbor. He said that as he left to go to the market, he saw the Defendant sitting on the next-door neighbor's porch and thought another man also was there. He said he and the Defendant did not speak to each other when he left.

Mr. James testified that when he returned, Nyron Roberts and Mr. Jones told him the victim had been shot. He said the victim was lying on the floor inside the front door. He said he called 9-1-1. He said that they began taking the victim to the car but that a police officer told them it would be better to wait because an ambulance was around the corner. He said, though, he knew the victim was already dead when they carried the body outside. He said he saw a vehicle leave the scene with Kim and the Defendant inside. He said Nyron Roberts and Mr. Jones told him the Defendant shot the victim. He said he did not stop the Defendant from leaving the scene because he planned to "[t]ake [his] own justice." He identified the Defendant in the courtroom as the person he saw with Kim.

On cross-examination, Mr. James testified that he talked to Detective Flores the night of the shooting and gave him information about the Defendant's appearance to help determine the shooter's name. He said that when Detective Flores said "Stanley," he agreed this was the correct person. He said he did not mention the Defendant's leaving with Kim because he wanted to seek justice himself. He said the police did not allow anyone inside the apartment. He said they put down the victim's body when the officer told them the ambulance was nearby. He acknowledged telling the police on the night of the crime that he thought the shooting was due to a romantic rivalry. He said someone told him this but did not remember the woman's name.

Mr. James testified that he lived in South Knoxville, not at Ms. Mathis's apartment. He said he went to Ms. Mathis's apartment to "hang out" and went to her neighbor's house to "make music." He said he and Ms. Mathis were the only people at the apartment that day who smoked.

Mr. James testified that he went to technical school for heating and air conditioning technician training but that he did not complete the program. He said his father, not he, wanted him to pursue the program. He said he did not know the Defendant when he first came to Knoxville. He acknowledged that he did not advise the victim, who was younger, not to carry firearms or sell drugs and that he was "part of it." He was certain that the victim did not know the Defendant. He said the victim was in jail when the Defendant moved to Knoxville.

-4-

Elander Mathis testified that she lived on Virginia Avenue in 2009. She said her name was the only one on the lease. She said she did not have children. She said "Kim" lived nearby in another apartment. She said Myron James, Mr. Roberts, and the victim visited her apartment in July and August 2009. She was aware that Mr. Roberts and the victim went to jail in the summer of 2009 and agreed they were not around in June and July 2009. She said that Mr. Roberts reappeared in late July 2009 and that he and Myron James began coming to her house to socialize. She said Myron James and she were not romantically involved.

Ms. Mathis testified that about 9:00 p.m. on August 4, 2009, she and Myron James left her house and went to Jimmy's Market while Mr. Roberts and the victim stayed at her apartment. She did not recall Mr. Jones being there. She said that the market was just down the street and that they went in Myron James's car. She said they were gone about five minutes. She said that when they returned, they saw the victim lying on his back in the kitchen. She said Myron James called 9-1-1 but "couldn't handle it" and gave her the telephone. She said Mr. Roberts and Myron James checked the victim's pulse while they waited for an ambulance. She thought the victim was in the front room when emergency medical personnel arrived but did not know how the body got there from the kitchen. She said she saw a vehicle pull up on Virginia Avenue but did not know who was inside the vehicle because she did not go outside.

Ms. Mathis testified that she did not recall seeing Kim Sharphe, a neighbor, when the police and emergency medical personnel were there. She said Ms. Sharphe drove a minivan at the time. She said she knew the Defendant as a neighbor because he had been living with Ms. Sharphe.

Ms. Mathis testified that when she returned from the market, there were two bullet holes in her screen and damage to the stairwell that had not been there when she left. She said that before August 4, 2009, no one had fired weapons inside her apartment. She said the victim, Myron James, and Mr. Roberts were not engaged in illegal activity, and she denied that they were selling drugs. She said there were no guns at her apartment and that she never saw any of the men with guns.

On cross-examination, Ms. Mathis testified that the men were not nicknamed the Miami Boys. She denied that anyone else lived in her apartment with her. She denied that Myron James or the victim ever spent the night there. She said that when she and Myron James pulled up after going to the market, Mr. Roberts came outside and told them the victim had been shot. She did not remember Mr. Jones being present when she went inside. She said Mr. Roberts was panicked. She denied that anyone cleaned or disposed of anything. She said she never saw the men take the victim outside while she was on the telephone and

did not recall if they took the victim outside after the call. She said her back was turned. She later admitted the men took the victim outside after the 9-1-1 call. She denied that she went outside but later admitted she went in and out of the apartment a couple of times. She denied that they took the victim outside to keep the police out of the apartment or that she disposed of drugs when she went in and out of the apartment. She said they went outside to look for help and that they asked neighbors to help. She did not recall a police officer telling her to stop going in and out of the apartment. She said someone went in and out of the apartment. She said it was not the victim and agreed that Mr. Roberts was with "his brother."

Ms. Mathis testified that "Bo," who lived nearby had music recording equipment. She did not know when the men planned to go to Bo's apartment to record music. She knew the Defendant from the neighborhood but did not recall if the Defendant knew the victim, Mr. Roberts, or Myron James. She did not recall whether the Defendant had been to her apartment. She said the victim, Mr. Roberts, and Myron James had come to her apartment for months to "watch movies and chill." She said that they were friends but that she was not a girlfriend to any of them. She did not remember what she wore on the night the victim was shot.

On redirect examination, Ms. Mathis testified that the area where she lived was nicknamed "the jungle." She said that before the victim was released from jail, his reputation was that he was "snitchin'" or working for the State. On recross-examination, she agreed that people who worked for the State were usually released from jail quickly. She said there were rumors that a person who worked for the State would have his bond lowered. She agreed that the victim was in jail for three months. She denied ever seeing the victim with guns or knowing that "they" sold drugs. She said she never asked Myron James where the victim was when the victim was in jail. On further redirect examination, she agreed she knew the victim and Mr. Roberts were in jail for "cocaine and guns."

Kimberly Sharphe testified that she met the Defendant two or three months before August 2009 and that they became romantically involved. She said he was from Detroit. She said that when she met the Defendant, she lived on Virginia Avenue and that her two minor children were "on the lease" with her. She admitted the Defendant stayed at her apartment "[o]n and off." She said he occasionally helped her financially. She said he "[s]old weed, cut hair, whatever he could do to make ends meet."

Ms. Sharphe testified that the intersection of Jourolman and Virginia Avenues was called "the jungle" and that it was not unusual to hear gunshots. She said that before her involvement with the Defendant, she had a sexual relationship with the victim.

Ms. Sharphe testified that she thought her children were outside playing with neighborhood children around 9:00 p.m. on August 4, 2009. She said that she went to a market two blocks away to get cigarettes and that the Defendant stayed at her apartment. She did not recall anyone else being at her apartment but said people were "in and out." She recalled seeing Darius Patterson, or "D," that day but did not recall seeing him when she went to the market. She did not see Myron James or Ms. Mathis at the market. She estimated she was gone about ten minutes.

Ms. Sharphe testified that Myron James told her the victim had been released from jail the previous Monday. She said people in the neighborhood were talking about the victim being a "snitch." She said the victim was "slingin'," meaning he sold drugs. She said that the Defendant was present when people discussed the victim's being a snitch but that she did not discuss it with the Defendant.

Ms. Sharphe testified that as she pulled up to her apartment when returning from the store, she heard two or three gunshots. She said the neighborhood was "in pandemonium." When asked if she saw anyone run past her apartment, she said, "No one in particular." She did not see the Defendant running. She said she went in her front door, found no one inside, and went out the back door. She went to her neighbor's house and found her children. She stated that someone said a person had been hit. She said she went to the front of the apartment and saw the victim's body on the sidewalk. She said Myron James stood over the victim's body and asked her, "Where that n----- go?" She asked who he meant, and he told her that she knew who he meant and that the person shot his brother. She said she had no idea to whom Myron James referred. She called her Aunt Vickie to pick up her children, and she went to her aunt's house. She said that she returned to her apartment later that night to get her children some clothing and that the Defendant was not there.

Ms. Sharphe testified that a detective came to her apartment that night and asked her about the shooting. She said that later that evening, a friend asked to meet her. She said that when she arrived, the Defendant was with her friend. She said that she and the Defendant went to a liquor store on Albert Avenue, that she left the Defendant with her Aunt Vickie and Uncle Gary, and that they went to Nashville. She said they did not part ways in Nashville. She said that she was aware the Defendant was a homicide suspect but that she did not talk to him about the shooting. She said that on the way to Nashville, the Defendant was distraught and upset and cried. She said the Defendant never told her what happened, that the victim had a gun, or that the Defendant acted in self-defense.

On cross-examination, Ms. Sharphe testified that during the time she had a romantic relationship with the victim, the victim had another girlfriend. She said she met the Defendant after she and the victim were no longer involved. She said the victim and his

friends were called the Miami Boys. She said that they were known to carry guns and that they sold drugs from multiple apartments, including one near hers and one on Jourolman. She agreed the Defendant had a "good gig" because he stayed at her apartment and did not pay rent or buy food. She agreed he was a "hustler" who bought marijuana to sell and use personally. She said he sometimes borrowed money to buy marijuana. She said there were two rumors: that the victim was killed because he was a snitch and that he was killed "over a girl," meaning her. She said she was not aware of the Defendant having pending drug charges when the victim was killed. She agreed she would have known if he had pending charges because she would have posted his bond. She agreed the Defendant went from her apartment, number 9, to apartment 7 to buy marijuana from the Miami Boys.

Ms. Sharphe testified that the Defendant was the "most gentle person" she ever met and that shooting the victim was out of character. She said that when she saw the victim's body outside, Myron James was with him and that no one else was there. She denied that Mr. Mathis or Mr. Roberts were there. When asked if Mr. Jones was there, she said she did not know who he was. She said there was no ambulance present. She heard voices from Ms. Mathis's apartment.

On redirect examination, Ms. Sharphe testified that she was not aware that the Defendant carried a loaded .40 caliber Smith & Wesson handgun with the serial number removed. She said she was not aware of his being armed. She said she worked full time. She was aware a search warrant was executed on her apartment. She identified photographs of her apartment, which depicted a box of bullets on a television stand. She said that the bullets were not hers and that she was not aware they were there. She said she was at work all morning when the bullets were found. On recross-examination, she did not know if cocaine was found during the search and said that a small amount of marijuana was found but that no pills or "heavy duty drugs" were found. She identified a photograph of marijuana on a tray in her apartment and said it was the Defendant's or hers.

Gary Dyer, Kim Sharphe's uncle, testified that he lived on Albert Avenue in August 2009. He said that he met the Defendant, who was introduced as Ms. Sharphe's friend in 2009, and that the Defendant was at his house three or four times before August 4, 2009. He said he talked to the Defendant in his yard on August 4, 2009. He stated that the Defendant said he had been "put in a bad situation . . . [i]n the project." He said that while they were talking, two police officers arrived and that the Defendant ran the other way, jumping Mr. Dyer's back fence. He said he later learned that Ms. Sharphe brought the Defendant to his house.

On cross-examination, Mr. Dyer testified that the Defendant was upset. When asked if the Defendant cried, Mr. Dyer said the Defendant "was wiping tears." He said the Defendant did not explain the bad situation he faced.

Darrell Ann "Vickie" Dyer, Ms. Sharphe's aunt, testified that she lived on Albert Avenue. She said that on August 4, 2009, the Defendant was Ms. Sharphe's boyfriend. She said that on the evening of August 4, Ms. Sharphe called and asked her to pick up Ms. Sharphe's children and not to ask questions. She said she brought the children to her house. She said the Defendant was not at her house when she returned, nor had he been there earlier. She said that Ms. Sharphe came to her house to check on the children, that she and Ms. Sharphe talked, and that the Defendant arrived fifteen to twenty minutes after Ms. Sharphe. She said the Defendant cried and tried to persuade Ms. Sharphe to go home. She said that police officers ran up her driveway and that she did not see the Defendant, who had been outside with her husband. On cross-examination, Ms. Dyer said the Defendant cried hard.

Jonathan Jones testified that he had lived in Knoxville all his life. He said he had relatives who lived in the Western Heights area in August 2009. He said he was a student and a drummer for his church. He said he was "in the process of recording" music in the summer of 2009. He said his cousin, who lived on Virginia Avenue in Western Heights, had recording equipment he used.

Mr. Jones testified that he was in Western Heights on the night of the victim's death. He said he met Myron James and the victim, who his cousin said were "new talent." His cousin was not home when he first arrived. He said that he, Myron James, and the victim recorded two songs at his cousin's apartment and that he went to an apartment at the end of the building. He said he went there to "hang out" and wait for his cousin to come home from work. He did not know the name of the woman who lived at the apartment and described her as short. He did not know the name of the person with "dreads" who was there but later agreed that Nyron Roberts's name sounded familiar. He said the victim was also at the apartment, although he did not know the victim's name that night.

Mr. Jones testified that he thought Myron James and the woman who lived in the apartment went to the store and said he and the others who remained listened to music. He said that no drugs were used and that no one entered or left the apartment. He said that the victim stood and that he and Mr. Roberts sat on a couch. He said that he heard a knock on the door and that the victim talked with the person on the other side of the door, whom he could not see. He said he was not familiar with the voice he heard but described it as being African-American and not that of a person from the South. He said that the person asked for marijuana but that the victim claimed not to have any. He said that he did not pay attention to all the conversation but that it became heated. He said that the victim locked the screen

door and that he heard the person on the other side of the door accuse the victim of "snitchin'." He said he looked at Mr. Roberts and heard shots. He said the victim fell and hit his head on the steps. He said Mr. Roberts panicked and tried to get the victim away from the doorway. He said he never saw the person who shot the victim. He said he and Mr. Roberts pulled the victim to the far left of the living room. He said he did not see anything fall from the victim's body or hands when the victim fell after being shot. He said he never saw anyone go through the victim's pockets. He said the victim tried to talk but could not. He said that when Myron James and the short woman returned, he and Mr. Roberts were standing beside the victim. He said he and Mr. Roberts took the victim outside because they were trying to get him closer to an ambulance. He said Mr. Roberts called 9-1-1 and handed him the telephone. He said he talked to the dispatcher and gave the telephone to the short woman.

Mr. Jones testified that police officers arrived within about ten minutes of the shots. He said they asked Mr. Roberts and him what happened and that he told them someone had been shot. He said that he asked to go inside the apartment to retrieve his car keys, that he was not allowed inside, and that an officer brought him the keys. He said he and Mr. Roberts, the person with dreadlocks, were inside a police car together and were taken to the police department to meet with investigators. He gave a statement to Investigator Floras. He said he never saw a gun or any cash on August 4. He said his cousin's neighborhood was nicknamed "the jungle."

On cross-examination, Mr. Jones testified that he did not know Mr. Roberts well enough to know his name or nickname on August 4, 2009. After having his recollection refreshed with his prior statement to the police, he said he had known Mr. Roberts' nickname, NJ, but that his mind "went blank" later. He said his cousin's nickname was "Albow." He stated that he went to his cousin's workplace that day and that his cousin said he had new talent. He stated that he told his cousin he would go to his cousin's house to wait for the new talent. He said that he went to his cousin's house and that Myron James, the victim, and "the guy with the dreads" arrived later. He said it was around mid-day or 5:00 p.m. but could not recall the exact time. He said they went upstairs to the recording studio and then went to the apartment at the end of the building. He said they were at his cousin's apartment for about an hour. When shown his prior statement, he acknowledged he never told Investigator Floras that he had been at his cousin's house recording with the other men. He agreed that his prior statement said that he was at apartment 7 waiting for his cousin to come home. He said Myron James was at the store and did not dial the 9-1-1 call or talk to the dispatcher. He was positive he saw the victim lock the screen door, and when asked about his prior statement, he said he might not have mentioned this if he was not asked. He said he did not say in his previous statement that he heard a "jiggle at the door" and was afraid someone was coming inside the apartment to kill the witnesses. He said he was scared

and panicked after the victim was shot. He moved the victim because the victim's brother asked him to help. He testified inconsistently about whether he helped "MJ" or "NJ" carry the victim outside. He did not recall whether he or the other person unlocked the screen door and maintained that he saw the victim lock the screen door earlier. He said that after they took the victim outside, the victim began convulsing, and they laid him on the ground. He said that after they took the victim outside, Myron James and Ms. Mathis arrived. He said he never saw NJ enter and leave the apartment and did not know if the short woman entered and left the apartment. He said that at some point that evening, he was in the back of a patrol car with the person who had dreadlocks, whom he knew as NJ. When asked why he did not call 9-1-1 immediately, he said he panicked and focused on helping the person with dreadlocks. He said he smoked cigarettes but did not recall seeing any that evening. He said he did not hear the nickname Miami Boys that evening.

Mr. Jones testified that he had not talked to any of the other witnesses except briefly in court. He said he told them he was attending church and school and trying to live a productive life. He said he worked at a recently opened restaurant.

On redirect examination, Mr. Jones testified that a matter of minutes passed when he and Mr. Roberts panicked and did not call 9-1-1. On recross-examination, he said he and Mr. Roberts pulled the victim away from the door and waited until they did not hear anything outside before taking the victim outside.

Michael Mays, an employee of the Knox County Emergency Communications District, identified an audio recording of the 9-1-1 call made relative to the victim's shooting and an audit log of the call. The 9-1-1 call was played for the jury. The audit log reflects that the call began at 8:50 p.m.

Knoxville Police Officer Benjamin McVay testified that at approximately 8:50 p.m. on August 4, 2009, he was dispatched to a shots fired call on Virginia Avenue. He said that he was about two blocks away and that when he arrived, he saw two men and a woman dragging a man who had been shot from an apartment. He stated that he told them to lay down the victim, who was bleeding profusely. He said one of the men stated he was the victim's brother. He said he stayed with the victim until emergency medical personnel arrived and did not allow anyone to go through the victim's pockets. He thought the only people with the victim were the woman and two men, but his main focus was the victim. He said the people with the victim were excited and upset. He said he did not know the victim, Myron James, or Nyron Roberts. On cross-examination, he said he did not recall physical descriptions of the people he saw. He agreed that due to his focus on the victim, he did not know what the woman was doing or if there was an additional man present.

-11-

Knoxville Police Lieutenant Kenny Miller testified that on August 4, 2009, at approximately 8:50 p.m., he heard a call and began traveling to the scene from another area of town. He said he was a supervisor and wanted to ensure that the scene was preserved, the crime scene log was maintained, and the victim received medical treatment. He said that when he arrived, the fire department was rendering first aid and that the crime scene tape was at least partially up. He said he was informed that the suspect ran toward Jourolman Avenue. He said he and Sergeant Calpetcher walked the path the suspect took in order to search for evidence. He said they found a gun against a wall. He said the gun was dry, but the ground around it was wet.

On cross-examination, Lieutenant Miller testified that his name was not on the crime scene log. He said Nyron Roberts and Elander Mathis were not listed on the log. On redirect examination, he said he would not be listed on the crime scene log if he did not enter the area within the crime scene tape. On recross-examination, he agreed that Myron James's and Jonathan Jones's names were on the log.

The parties stipulated that at 10:26 p.m., the E911 Center received a call requesting that the police respond to 1921 Albert Avenue because the suspect in a shooting was in the yard. Knoxville Police Patrol Supervisor Robert Taylor testified that he heard the dispatch resulting from the 10:26 p.m. call and that he responded. He said that when he arrived, he saw a chainlink fence around the house with an open gate. He said a white male stood behind a pickup truck and another figure ducked behind a vehicle and ran toward another house. He said he followed but did not find anyone. He said he waited for another officer to arrive before searching on the other property. He said he returned to 1921 Albert Avenue and talked to Gary Dyer. On cross-examination, Officer Taylor said the person who fled did not threaten him.

Knoxville Police Senior Evidence Technician Beth Goodman testified that she documented the scene by taking photographs, measuring distances, drawing a diagram, and collecting evidence. She described the photographs as they were displayed to the jury. She said there were two "bullet defects" in the screen door with the "prongs of the screen" going into the apartment. Another bullet defect appeared in the concrete railing leading to the second floor of the apartment. She said there were bullet fragments and a blood trail in the apartment. She noted bloody shoe prints and pools of blood. She said they were unable to recover a bullet fragment from a wall. A .40 caliber shell casing was found on the sidewalk in front of the apartment. A .40 caliber Smith & Wesson handgun with its serial number ground away was propped against a wall at 1819 Jourolman Avenue, Apartment 39. She said nine cartridges were in the gun, eight in the magazine and one in the chamber. She swabbed the gun for evidence and processed it for fingerprints. She identified as exhibits the screen with the bullet holes, an aerial photograph depicting the location the gun was found, a

diagram of the scene she prepared, the .40 caliber casing found outside, a lead fragment found by the front door, and fragments from the apartment. She said she looked extensively for a second shell casing but was not able to find one. She said no identifiable fingerprints were found when the evidence from the gun and the apartment was examined.

On cross-examination, Ms. Goodman testified that there was a blood trail leading to the kitchen. She agreed that if sofa cushions had been moved to search for evidence, the photographs would reflect it. She agreed that it was common for drugs or guns to be hidden under sofa cushions.

Knoxville Police Sergeant Ryan Floras testified that in August 2009, he was the lead investigator in the victim's shooting. He said he responded to the scene around 9:00 p.m. He said that the immediate crime scene was at apartment 7 but that it was expanded to include apartment 9 because of a cell phone found at apartment 9. He said Officer McVay directed him to Nyron Roberts and "Jonathan Logan" as witnesses who were inside the apartment at the time of the shooting. He said they were frisked and placed in the back of a patrol car to be taken to the police department for questioning. He said Myron James was present but was not considered a vital witness at the time, although Myron James gave a statement later. He said he viewed the scene and followed Ms. Goodman as she took photographs, directing her to evidence. He said that he had her take photographs of shoe prints in a corner of the apartment but that they did not concern him at the time. He said that there were several residents outside the crime scene tape but that none were able to provide information regarding a suspect.

Sergeant Floras testified that Nyron Roberts and Myron James provided the names Stanley and James but did not know the order of the names and said they knew the suspect was from Detroit. He said that using police databases, the police identified the Defendant, Stanley Abernathy James, from Detroit, and issued a "be on the lookout" (BOLO) to patrol officers. He said he was made aware that Sergeant Taylor had chased the Defendant from Mr. Dyer's yard on August 4, 2009. He said he was notified on September 18, 2009, that the Defendant had been stopped in a vehicle in Pennsylvania. The Pennsylvania authorities detained the Defendant.

Regarding the footprints in the corner, Sergeant Floras testified that he did not believe they had any evidentiary value because the apartment was small. He said that four people plus the victim were in a small room and that someone would have to "get out of the way" in order to move the body. He said that when officers first arrived, they would tend to the victim and then sweep the apartment for potential hazards. He said the apartment was cleared visually in this case before the crime scene tape was used.

-13-

Sergeant Floras testified that after the victim's body was removed, he received Elander Mathis's consent to search her apartment. He said she told the police she lived alone. He said they searched the apartment for guns, drugs, or other contraband but did not find any. He said they searched in cabinets, under cushions, and under the beds.

On cross-examination, Sergeant Floras acknowledged that DNA testing on the cell phone in apartment 9 showed that it was not the Defendant's. He agreed the phone belonged to Darius Patterson. He agreed that the transcript of Jonathan Logan Jones's interview reflected a date and time of August 5, 2009, at 2:00 a.m. and that the transcript of Nyron Roberts's interview reflected a date and time of August 5 at 1:16 a.m. He agreed that Mr. Jones and Mr. Roberts were in a police car together before their interviews and that both said the victim was shot because he was a snitch. He agreed that Myron James was interviewed first, at 12:32 a.m. on August 5, and that he said the victim was killed "over a girl." He agreed the police did not know how much time elapsed between the shooting and the 9-1-1 call or what happened before the police arrived. He said they did not search any cars at the scene.

On redirect examination, Sergeant Floras testified that Mr. Jones's keys were recovered at the scene. He said that after they were photographed and documented, he returned them to Mr. Jones.

Knoxville Police Department employee Patricia Resig testified as a firearms identification expert. Based upon her examination of the evidence, it was her opinion that the cartridge case from the scene and the bullet from the victim's body were fired from the gun from the scene.

Tennessee Bureau of Investigation (TBI) Special Agent Don Carmon, an expert in firearms identification, testified that based upon his examination of the evidence, the gun was fired from 12" or less from the screen. He did not find any gunshot residue on the victim's shirt and said the screen could have prevented any residue from reaching the shirt.

TBI Special Agent Jennifer Milsaps, an expert in serology and DNA identification, testified the gun contained the DNA of at least two people. She said DNA of the major contributor was consistent at four of thirteen locations with the Defendant's DNA and was inconclusive due to insufficient or degraded DNA at the remaining locations. She testified that the presumptive serology test she conducted on a cell phone did not indicate the presence of blood. She said that a partial DNA profile from the cell phone was consistent at three locations with a sample from Darius Patterson and that the Defendant's DNA was not on the cell phone.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that the victim's body was received with the bullet in the body. She said abrasions containing metal fragments were around the wound, and fragments in the abrasions were consistent with a metal screen. In her opinion, the shot was fired from about three feet. She said that the victim's cause of death was a gunshot wound to the chest and that the manner of death was homicide.

Officer McVay was recalled and testified that he took a witness from the scene to the police department. He said the department's policy was that witnesses be transported individually. He said that in this case, multiple patrol cars were used to transport multiple witnesses. He said he had never put two witnesses in his patrol car.

On cross-examination, Officer McVay acknowledged that two suspects might be placed in the back of a patrol car and a recorder activated to capture incriminating statements. He said this was done with suspects, not witnesses. He did not know which patrol cars were used to transport the witnesses or which witness rode in a particular car. He acknowledged that unless he reviewed a video recording, he could not refute a witness's statement that the witness was in a patrol car with another witness.

The Defendant testified that he was from Detroit and came to Knoxville in March 2009 to visit relatives. He said he stayed at his sister's apartment. He met Kim Sharphe, became romantically involved with her, and moved into her apartment, which he identified as unit 9 on Virginia Avenue in the Western Heights housing project. He said that he was not working but that Ms. Sharphe worked, paid the rent, and provided groceries. He said the Miami Boys frequented the apartment next door, which he said was unit 7.

The Defendant testified that the Miami Boys had the neighborhood "on lock down," meaning they sold drugs. He identified an apartment two units from apartment 9 as the "weed spot" and an apartment on Jourolman Avenue behind apartment 9 as the "heavy stuff apartment" where drugs like crack cocaine, heroin, and ecstasy were sold. He said the Miami boys had guns. He identified the Miami Boys as NY, MJ, E, Hen, and Coupe. He said MJ was Myron James and Hen was the victim. He said that NY was Nyron Roberts and that he had dreadlocks. He said that E went to jail about two weeks before the crime and that he was light skinned with dreadlocks.

The Defendant testified that he bought marijuana from all the Miami Boys except Coupe. He said he generally bought an ounce of "regular weed" for $150 to $175. He said there was a higher quality, "purp" or "purple kush" that cost $500 per ounce. He said the quantity of marijuana needed for one cigarette cost $25. He said he used a "hustle" to finance his marijuana use. He smoked one-half of the marijuana and sold one-half of it in

$25 quantities in order to pay for the entire purchase. He said he bought an ounce once or twice a month. He said he never saw the Miami Boys without a gun. He said Western Heights was a rough neighborhood. He acknowledged that the .40 caliber weapon in evidence was his gun and said he carried the gun when he lived in Western Heights. He said that neither he nor Ms. Sharphe had a car and that they sometimes used Ms. Sharphe's aunt and uncle's van.

Regarding August 4, 2009, the Defendant testified that he heard the Miami Boys had purple kush marijuana and that he wanted some. He said that while Ms. Sharphe went to the store in her aunt's van, he went to apartment 7 to buy marijuana. He said he had his gun in his right pocket but did not have a cell phone. He said he knocked on the screen and identified himself as Sosa. He said that the "big door" opened and that Nyron Roberts and the victim came to the screen door. He saw the victim's gun in the victim's right waistband. He said Mr. Roberts moved away from the door. He said he asked for an ounce of purple kush for $500, that the victim acknowledged they had the marijuana, that the victim cracked the screen door, that he gave his money to the victim, and that the victim closed the screen door. He stated the victim said, "Come back in an hour and I got you. I'll take care of you." He said he responded, "Oh, dog, I thought you had it on deck." He said that in a drug transaction, the drugs were usually provided immediately. He stated that the victim again said he would provide the marijuana later and that the Defendant said, "Come on now, man; you know how it go. I give you the money for the weed; you give me the weed. I'll go ahead about my business. It don't work like that." He said he should not have said it.

The Defendant testified that after he asked for his money, the victim "went all to hell." He stated that the victim angrily said, "B---- a--, n-----, what the f---? You think I'm tryin' to play you or somethin', n-----?" He said that the victim thought the Defendant did not trust him and that the victim seemed insulted. The Defendant said he became nervous and put his hand in his pocket. He said he told the victim that the victim tricked him and asked for his money. He said he reached for the screen. He said the victim reached for the victim's gun and said, "B---- a--, n-----, who the f---." He thought the victim was about to kill him, and he pulled out his gun and shot twice, striking the victim. He said he ran away. He said he put down the gun. He acknowledged he did not call 9-1-1 or the police. He agreed that he was taken into custody in Pennsylvania in October 2009 and that he had been in jail since then.

The Defendant testified that he did not let the Miami Boys have his $500 and run away because he did not want to be shot in the back of the head. He said that he had been robbed in Detroit and that after the robbers took his possessions, they stripped off his clothing and told him to run. He said that as he ran, they shot him in the back of his neck. He said he awoke a week later in the hospital. He said that as a result of being shot, his face

-16-

was partially paralyzed and his eye was "funny." He said he did not have pending drug charges on August 4, 2009.

On cross-examination, the Defendant acknowledged his prior Michigan felony convictions for firearms possession in January 2005 and delivery of a controlled substance in June 2007. He agreed that he was not allowed to possess a gun as a result of his convictions and that he was on probation in Michigan when he came to Tennessee. He said he began living with Ms. Sharphe in Western Heights around April 2009. He was unaware of musicians in apartment 10. He acknowledged he did not hunt or target practice and said he carried a gun for personal safety and would shoot someone if necessary. He said "nine times out of ten," people carried guns in Western Heights, including convicted felons. He acknowledged he carried the gun when he engaged in illegal transactions. He acknowledged he had owned a .25 caliber gun, which he obtained about a month before he shot the victim, but said he traded it and money for the .40 caliber gun involved in the shooting. He later said he had the .40 caliber for about two weeks before the shooting. He agreed he did not own the .25 caliber gun before he came to Knoxville and said he did not obtain a gun until he was living in Western Heights. He said he bought the .25 caliber gun from a "chronic" crack addict called Super Daddy.

The Defendant testified that he came to Knoxville by bus with about $15 for cab fare. He denied bringing a large amount of money with him to Knoxville. He said he smoked marijuana daily and did his hustle daily when he lived with his sister in Lonsdale, but he said he had not begun his hustle in Western Heights when he bought the .40 caliber gun. He said he bought the .40 caliber because "it was rough out there." He said he heard gunshots nightly in Western Heights. He agreed the .40 caliber was a larger, more powerful weapon than the .25 caliber but denied he bought the larger .40 caliber in order to inflict more damage on someone. He said that when he bought the .40 caliber gun, the serial number was scratched out. He agreed that he received ammunition when he bought the .40 caliber and that the .25 caliber ammunition in Ms. Sharphe's apartment remained from the time he had the .25 caliber gun. He agreed that the .40 caliber gun held fourteen rounds and said he received it fully loaded. He agreed that nine live rounds were recovered in the gun, that one was in the victim's body, and that another fired round was recovered. He agreed he knew how to operate the gun before August 4.

The Defendant testified that the nickname Miami Boys was known in the neighborhood and denied that he created the nickname for the trial. He agreed there were rumors the victim was snitching. He agreed that he knew about Ms. Sharphe and the victim's having a sexual relationship and that he had a nice situation with her when the victim was in jail. He did not know if Ms. Sharphe had romantic feelings for the victim when he killed the victim. When asked if someone who was snitching would be "slinging," or selling drugs,

he said, "Not really." He agreed that Mr. Roberts and the victim had been in jail most of the time he lived with Ms. Sharphe. He maintained, though, that he bought marijuana from the Miami Boys other than Coupe outside the door of apartment 7. He said he paid for his purchases with five $100 bills. He agreed it would have been easy for the police to monitor the drug sales but said he had not seen a police presence in Western Heights.

The Defendant testified that Darius Peterson's nickname was "D." He agreed that Mr. Peterson was from Detroit but denied that they were "buddies." When the prosecutor asked if Mr. Peterson was "hangin' out with" the Defendant before the homicide," the Defendant replied, "Yes, sir." He said he did not know where Mr. Peterson went. He said that "E" was not the same person as Jonathan Jones and that he had never seen Mr. Jones in the neighborhood. He said he did not know why Mr. Jones would testify falsely against him.

The Defendant disagreed that neither he nor the victim had somewhere to go when they faced off with guns. He demonstrated the victim's actions that placed him in fear for his life. When asked if he intended to kill the victim, he said he intended to shoot the victim. He acknowledged he aimed for and hit the "center mass" of the victim's body. He agreed he shot twice. He denied that he saw the victim fall. He agreed the second shot had a downward trajectory as shown by its strike at 22" of a concrete pole because he shot down at the victim as he fell. He said everything happened quickly.

The Defendant testified that he ran away because he was scared of the Miami Boys. He acknowledged placing the gun against a building but denied wiping away fingerprints on the gun. He said he jumped some fences and ran to "Sparkles's" house in the "Ville." He said that his first access to a phone was at Sparkles's house and that he chose not to call the police. He agreed he contacted Kim Sharphe and told her to take him out of town. He agreed he stopped at a liquor store before going to Albert Avenue. He acknowledged that he knew the police were looking for him and that he saw helicopters searching for him.

When asked why he first advanced his self-defense theory at the trial, the Defendant testified that he was scared and panicked. He did not think the victim's family would believe him. He agreed that he could have provided the police with information about the Miami Boys' criminal enterprise and that he ran because he was guilty.

On redirect examination, the Defendant testified that his guilt referred to his admission he shot the victim. He said he told the jury the truth. When he said he did not know who would believe him, he was referring to the two Miami Boys who were the victim's family members and were present for the shooting. On recross-examination, he agreed he knew the victim had been arrested twice in six months and had been released on bond the day before the shooting.

The parties submitted as stipulated exhibits the victim's arrest warrants. They reflected arrests for drug and weapons charges on October 22, 2008, January 2, 2009, and May 20, 2009. The October 2008 warrants alleged that the victim was a passenger in a car stopped for a moving violation. Before the stop, the officer saw the passenger throw a bag containing eleven rocks of crack cocaine and a bag containing marijuana from the car. The January 2009 warrants alleged that officers entered 1734 Virginia Avenue, apartment 13, where they saw the victim sitting on a couch near a table containing a loaded handgun, about three-quarters of a pound of a leafy green substance, a white powder, and a scale. The officers found two nine millimeter handguns and an AK-47 rifle in a bedroom. A pitbull puppy was in the apartment. The victim had cash of an undetermined amount on his person when he was arrested. The May 2009 warrant alleged that a search was conducted of an apartment on Jourolman Avenue at which multiple undercover drug purchases had taken place. The victim was present when the warrant was executed. The search yielded five loaded handguns, a loaded shotgun, a loaded rifle, large amounts of currency, multiple bags of a rock substance believed to be cocaine, multiple sets of digital scales, Ziplock bags, corners of bags, and razor blades.

The jury found the Defendant guilty of second degree murder. The trial court sentenced the Defendant to serve twenty-five years at 100% as a Range I, standard offender. The Defendant filed a pro se motion for appointment of new counsel and alleged that he did not know whether his trial counsel had filed a motion for a new trial. He also alleged that trial counsel provided ineffective assistance at the trial. The court appointed new counsel to represent the Defendant. According to a transcript of a hearing at which the newly appointed counsel represented the Defendant, counsel filed a petition for post-conviction relief because the Defendant was denied his right to an appeal. The petition does not appear in the record. The record does not contain a motion for a new trial, although it contains an amended motion for a new trial filed by the second attorney. The prosecutor stated that he had spoken with trial counsel, who admitted he had not filed a motion for a new trial or a notice of appeal, and that the State conceded that trial counsel provided ineffective assistance in this regard. Although the court did not directly address the merits of the ineffective assistance claim, it conferred with counsel about a date for a hearing on the motion for a new trial. The court minutes state that the court granted the Defendant's oral motion to file a delayed motion for a new trial and notice of appeal. After a hearing, the court denied the motion for a new trial, granted a delayed appeal, and held the remaining post-conviction claims in abeyance.

On appeal, the Defendant contends that the evidence is insufficient to support his conviction and that the proof shows he is guilty of the lesser offense of voluntary manslaughter. The State responds that the evidence is sufficient to support the second degree murder conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S .W.2d 651, 659 (Tenn. 1997). "'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)).

As relevant to this appeal, second degree murder is the unlawful, knowing killing of another. T.C.A. §§ 39-13-201 (2010), -210(a)(1) (2010). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 39-11-106(a)(20) (Supp. 2009) (amended 2011). A person who has reasonable fear of imminent danger, death, or serious bodily injury is justified in using force in self-defense to the degree necessary to protect against the other person's use of unlawful force. *Id.* § 39-11-611. When self-defense is fairly raised by a defendant, the State has the burden of proving the defendant did not act in self-defense. *State v.* , 45 S.W.3d 1, 10 (Tenn. 2001). However, the issue of whether a defendant was justified in using self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 742 (Tenn. Crim. App. 1994).

In the light most favorable to the State, the evidence reflects that the Defendant admitted that he armed himself with a loaded handgun and went to purchase drugs at the apartment where the victim sold marijuana. The Defendant and the victim argued, and the Defendant accused the victim of being a snitch. The Defendant shot the victim, firing the gun twice. The Defendant claimed that the victim reached for a gun and that he shot the victim in self-defense, but no gun was recovered from the scene or the victim's body. Rather than summoning help, the Defendant fled the scene and later fled the State. A rational jury could conclude beyond a reasonable doubt from this evidence that the Defendant shot and killed the victim and was aware that death was reasonably certain to result.

In reaching this conclusion, we have considered the Defendant's argument that the record does not support the State's theory that the victim was killed for being a snitch. He argues, "[T]here was nothing to suggest that the Appellant would have been a target of such an investigation or suffered any negative consequences from the victim's cooperation with authorities, even if such cooperation had or might occur." The record reflects that the Defendant's habit was to buy an ounce of marijuana and sell a portion of it in small quantities to finance the portion he used. The Defendant accused the victim of being a snitch. The

victim had just been released from jail. A rational jury could conclude from the evidence that the Defendant thought the victim was cooperating with authorities and that the Defendant was a target of an investigation of drug transactions in Western Heights.

Although we conclude that the evidence of second degree murder was sufficient, we have considered the Defendant's contention that he is guilty of the lesser offense of voluntary manslaughter. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *See id.* § 39-13-211(a) (2010). The Defendant testified that he shot the victim out of fear. Whether the Defendant was in fear and whether such fear was sufficient to produce passion by adequate provocation that was sufficient to lead him act irrationally were questions of fact that were resolved by the jury. This court may not revisit matters of witness credibility.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-21-